## SULLIVAN v. PIERCE.

(Circuit Court of Appeals, Fifth Circuit. October 6, 1903.)

### No. 1,053.

1. SALES—RESCISSION BY SELLER—FALSE REPRESENTATIONS.

Unless statements and representations made by a buyer to the seller of property were relied upon by the latter, and were the inducing cause of the sale, they afford no ground for its rescission by the seller, and it is immaterial whether they were true or false.

2. SAME—RELIANCE ON STATEMENTS—CONFIDENTIAL RELATION OF PARTIES.

The confidential relation existing between partners may be presumed to have continued after they formed a corporation to which the partnership property was transferred, and in which they were practically the only stockholders, and to have induced one in selling his stock to the

other, who was the active manager of the business, to place reliance on the latter's statements in respect to the condition and value of the property to the same extent as though the partnership had continued, in the absence of evidence to the contrary.

3. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* not to entitle complainant to a rescission of a sale by him to defendant of his stock in a corporation of which they were practically the only stockholders, on the ground of false and fraudulent representations made by defendant, who was the active manager of the business, it being shown that complainant was the minority stockholder; that the relations of personal friendship and confidence which for many years existed between the parties had been broken some time before the sale, making complainant desirous of terminating their business connection; and that in making the sale he did not act in reliance on any statements or representations made by defendant, but on his own independent knowledge and judgment, and received a price not greatly below the actual value of his interest in the property at the time.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

M. E. Kleberg and Charles W. Ogden, for appellant.

J. W. Terry and F. C. Proctor, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. This suit was brought by Daniel Sullivan, a citizen of Great Britain, against Abel H. Pierce, a citizen of Texas, to rescind a sale. The parties had been friends for many years, and each had confidence in the business integrity of the other. They formed a partnership for the purpose of purchasing real estate and cattle and to raise and sell cattle. Sullivan put in one-fourth of the capital, and Pierce and his brother three-fourths. Pierce soon bought his brother's interest, so that the assets of the firm were owned by Pierce and Sullivan, the former owning three-fourths interest and the latter one-fourth. Pierce was the active or managing partner. He bought for the firm about 55,000 acres of pasture and farm lands, and cattle to stock them. The investment of cash advanced and accruing profits amounted to large sums, variously estimated from $200,000 to $300,000. During the partnership, which existed about a year, Pierce lived on or near the ranch, and Sullivan in a county near by. Pierce was a "cowman," and was in charge of the partnership business, and Sullivan was a banker. Pierce furnished Sullivan annually with an account or statement showing the condition of the partnership business. By mutual agreement, in the year 1883, a corporation was formed to own the ranch and cattle, which was capitalized at $1,000,000. Stock of the par value of $250,000 was issued to Sullivan, and stock of the par value of $750,000 was issued to Pierce, less a few shares, probably 5 or 6, which were held by a member of Pierce's family. By agreement, Pierce was to be, and he did become, president, and Sullivan secretary, of the corporation. The officers received no salaries. Pierce continued to manage the business just as he did during the partnership, but there were regular meetings of the directors, of which minutes were kept.

On May 9, 1896, after correspondence and negotiations, which will be referred to later, Sullivan sold his stock in the corporation to Pierce

for $50,000 in gold, $10,000 to be paid before July 1, and $40,000 on or before December 1, 1896, with 6 per cent. interest. Pierce paid the purchase money and received the stock. Two years after the sale, May 9, 1898, this bill was filed for its rescission. It charges that the sale was procured by fraud. It is alleged that the complainant had great confidence in the defendant, and in making the sale relied on his assertions regarding the property. The following are the false and fraudulent statements alleged in the bill to have been made by the defendant to the complainant: "(1) That the land, if put up and sold for cash, would not bring the amount paid for it; (2) that a large and valuable plantation upon the land had been totally ruined by Johnson grass; (3) that high taxation and continued land litigation had depreciated the value of the land; (4) that the stock interest in that section of the country was on the heels of the biggest die up that was ever known in that country, thereby intending to cause your orator to believe that a large number of the cattle belonging to your orator and said defendant, as stockholders of the said Pierce-Sullivan Pasture & Cattle Company, had recently died; (5) that the ranch would not pay two per cent. on the investment; (6) that complainant's interest in the property was not worth more than $50,000."

The defendant having answered, and evidence having been taken (nearly 2,000 printed pages), the Circuit Court dismissed the bill, refusing on the merits to cancel the contract of sale. The complainant appealed, and the decree of the Circuit Court, with specifications, is assigned as error.

The theory of the bill is that there were confidential relations between the complainant and the defendant growing out of their long and intimate business and personal association, and that the sale was made by the complainant "believing that said representations were truthful, and represented the actual facts, and relying upon the obligation of the defendant to deal fairly and truthfully with him in relation to said property." It is averred, and an effort made to prove as an essential part of the complainant's case, that the relations between the parties to the contract were such that the complainant was entitled to and did rely in making the sale on the defendant's representations, and that he did not rely on knowledge obtained from other sources and on an independent investigation.

It is clear that if Sullivan sold to Pierce, exercising his own judgment as to the value of his interest, depending on his knowledge of the value of the property obtained from other sources, and not relying on Pierce's statements, that it is immaterial whether Pierce's statements were true or untrue. It is a necessary step in the complainant's case to show that in making the sale he relied on the alleged false representations of the defendant. Until that appears, we are not called on to investigate in detail whether the statements are true or false.

The evidence abundantly shows that for many years the complainant and the defendant were intimate friends; that they had large business dealings, showing mutual confidence; that they became partners; that the defendant was the active partner in control of the business; and that the relation between them was one of great personal confidence, aside from what the law implies from the fact of their part-

nership and the mode of conducting the business. Notwithstanding
the fact that they formed a corporation and transferred to it the part-
nership property—they being practically the only stockholders and
the business being conducted in practically the same way as during
the partnership—this relation of confidence would be presumed prima
facie to continue. Although the sale of the stock was made by the
secretary to the president of the corporation, the peculiar facts of the
case are such that we may look at it as practically a sale by one part-
ner to another of his interest in the partnership property. Looking
at the substance, and not at the form, we may consider the trade as
one made between partners; and prima facie, in the absence of evi-
dence to the contrary, we would conclude that the complainant relied
on the statements and representations of the defendant. But we find
the record pregnant with evidence—much of it the evidence of the
complainant—which rebuts this conclusion. The evidence does not
present to us the picture of one partner confidently relying on the
representations of another, and being induced to make a sale by such
representations, but of two unfriendly men, anxious to separate their
joint holdings, and negotiating at arm's length to produce that result,
each acting on his own judgment, and the seller placing no confidence
whatever in the buyer's statements.

In February, 1895, the pleasant personal relations between the com-
plainant and the defendant were interrupted by a disagreement be-
tween members of their families, and the latter announced that he
would never enter the banking house of the former again. Sullivan
claimed that it was agreed that the corporation's stockholders' meet-
ings should be at San Antonio, and that the president was to have no
salary. On February 3, 1896, Pierce, the majority stockholder,
caused the by-laws to be so changed as to remove the company's
office from San Antonio to the company's ranch, and to permit the
president to be paid a salary. Sullivan, who was present at the meet-
ing when these changes were made, charged, by his attorney, that they
were made "to perpetrate a fraud." On February 10, 1896, by letter,
Sullivan called on Pierce for statements of account, and on February
24, 1896, drew on Pierce for $4,527.90, an amount claimed as due him
by the statement of account. The draft was not paid. On March 4th,
Sullivan appointed Herman Brendel his agent "to make full investiga-
tion into all matters of account, statements, and books pertaining to
all business transactions" between complainant and defendant, includ-
ing the business of the Pierce-Sullivan Pasture Company. From
March 10 to April 4, 1896, Pierce wrote three times to Sullivan to
have the seal and books of the company sent from San Antonio to the
company's new office on the ranch. On March 31, 1896, Sullivan, by
Brendel, his cashier, replied that Pierce's letters were referred to his
(Pierce's) attorney. On April 9, 1896, Pierce wrote Sullivan about
the company's books: "If you desire to send any detective or ex-
pert down here to examine them, he shall be shown every courtesy,"
etc. "If I have been robbing you as long as you have reported I
have been, why have you not discovered it before?" Brendel, duly
authorized to investigate the company's books for Sullivan, visited
the ranch. He returned, and reported to his employer that he was

not allowed a fair opportunity to examine the books, and that Pierce, charging Brendel with making remarks concerning the company's business reflecting on Pierce, had threatened to have Brendel killed.

A mere recital of these occurrences is sufficient to show that unfriendly feeling existed between the parties, and that Sullivan was not in a condition of mind to rely implicitly on representations made by Pierce.

On April 10, 1896, Sullivan wrote to Pierce a proposition to sell his interest "for cost and eight per cent." On April 15th Pierce declined, and offered to sell on the same terms. On April 17th Sullivan wrote again, asking Pierce what he "would consider a fair figure" at which he would buy Sullivan's interest. On April 22d Pierce replied, offering $50,000 for Sullivan's interest, $10,000 to be paid on or before July 1, and the balance on or before December 1, 1896, with interest at 6 per cent. from July 1, 1896. On April 24, 1896, Sullivan replied, offering to take $75,000 for his interest on the terms as to payments and interest as proposed by Pierce. On April 27th Pierce wrote again, declining to give $75,000. On May 1, 1896, Sullivan again wrote, saying that he would like to settle the ranch affair "amicably," and suggested an interview. In subsequent letters they agree to meet in Galveston, at the Tremont Hotel, on May 9, 1896. In Pierce's letters (which we have not quoted in full) several of the representations are made which are charged in the bill. The general tone of Pierce's letters tends, in the trader's usual way when buying, to depreciate the property, and the general tone of Sullivan's letters, as is usual with a seller, tends to appreciate the value of the property. It is Sullivan who offers to sell, and who requests the interview. The correspondence shows a minority stockholder, unable to control the corporation, anxious to sell, and a majority stockholder in control, willing, but not seemingly anxious, to buy.

The parties met, as agreed, on May 9, 1896. Sullivan, being asked what occurred at the Tremont Hotel, answered: "It was very short. I told him I had come to see if we could make an amicable deal for the property, and he said he would not give me any more than he had written me. I told him I wouldn't take that. I began at $75,000. I told him I would take $60,000. He said he wouldn't give it to me. He said, 'You will have to take my offer or let it stand as it is.' " After testifying that he finally accepted Pierce's offer, he was asked: "What did you think of it at the time?" He answered: "I thought it was worth a good deal more; if he would have divided with me, I wouldn't have taken double the money." Pierce, testifying as to the interview, says he offered to sell to Sullivan at $180,000; that is, at the rate of $60,000 for a one-fourth interest. Sullivan in this interview accepted Pierce's offer of $50,000, but stipulated for payment in gold. Later, Pierce offered to pay the notes before they were due if Sullivan would discount them; and it is a significant fact that Sullivan, on May 26, 1896, expressed the opinion in a letter to Pierce that the occurrence of a named political event would cause "gold to command 25 per cent. premium at once," and on the happening of another event suggested that "gold will be a way up, possibly 2 to 1." "With these prospects in view," he added, "I would not entertain your proposition

to discount your notes, as the chances are I will make more by waiting."

The unquestioned facts and circumstances preceding and following the sale are such that we cannot believe that Sullivan was induced to make it by the representations of Pierce. At the time he made the sale he probably believed, as he testified, that the property was worth more than he sold it for. If he could have obtained a division, he said, "he would not have sold it for double the money." We cannot reconcile this evidence with the contention that he accepted the $50,000 on the faith of Pierce's assertion that it was a fair price. There were strong reasons why Sullivan might wish to sell. He was a minority stockholder, on unpleasant terms with the management of the corporation. He was a banker, making large interest on money in his business. He was getting small or no dividends on his stock. The majority stockholder had the power (never exercised, however) to lessen his dividends by fixing a salary for the president. He was suspicious that the property was managed unfairly. His agent sent to investigate had been threatened. The office of the corporation had been moved from San Antonio to a place inconvenient to Sullivan. These and other reasons, while they would tend to prevent his relying on Pierce's representations, would naturally make him desire to sell his stock. He had tried to sell to others, and now he turned to Pierce, and offered to sell to him. We think the learned judge in the court below correctly held that the evidence does not show that Sullivan was induced to make the sale by his reliance on representations made by Pierce.

But it is urged that the price paid is grossly inadequate. The evidence tends to show that cattle and grazing lands were very low when the sale was made. In the two years following the sale they greatly increased in price, probably nearly doubled in value.

The difficulty in estimating the value of lands and cattle is considerable. It is clear they are worth as much to the owner as they would sell for in cash. But, when the tract and herd are so large that there is no market for the whole, their value as a whole becomes a matter of opinion. The witnesses in this case place greatly differing valuations on the lands involved. The question here is, of course, what was the value of the property at the date of the sale. The complainant early in his effort to sell offered to take $75,000 for his interest, later he offered to take $60,000, and finally accepted $50,000. The defendant says that at the time of his purchase he offered to sell his three-fourths interest at the rate of $60,000 for a one-fourth interest. The learned judge who so carefully considered the case in the circuit court thought the one-fourth interest was probably worth $75,000. It requires conscious effort, when we attempt to estimate the value of the property at the date of the sale, to exclude from our minds the effect of the great increase in value immediately following the sale. Such increase, doubtless unconsciously to the witnesses, affected their testimony. This great advance in values made the complainant regret his sale, and probably sharpened his wits to discover badges of fraud.

We shall not attempt the useless labor of analyzing all the evidence on this point. When we exclude from our minds the effect

of the great increase in value within a short time after the sale, we are of opinion that the complainant, on the evidence, did not sell his interest for a sum greatly less than its value at the date of the sale. Exclude the great rise in values which necessarily occurred between the sale and the filing of the bill, and we find no fact alleged in the bill and disclosed by the evidence which, if known to Sullivan, would have probably prevented the sale. Leave out that fact—which was a subsequent occurrence unknown to both parties—and the sale seems fair, and not unwise. Sullivan's business, his relation to the company as a minority stockholder, and his then unpleasant personal relations with Pierce, would naturally lead him to sell. Pierce, owning three-fourths of the stock, his business being that of a "cowman," and the unpleasant relations with Sullivan, would naturally cause him to be willing to buy Sullivan's interest. With full knowledge of all facts disclosed by the record, but in ignorance of the rise in values that would occur in a year or two, we think the evidence shows that Sullivan would have sold his interest for $50,000 in gold, and we do not think that at that time he could have sold it as a whole at one sale for a larger sum. The sale does not reflect on his character, established by the record, as a shrewd man of affairs, for he did not deal unwisely on existing facts. He only failed in a matter of prophecy. He predicted that gold would go up and cattle down. If this had occurred, if cattle and grazing lands had fallen greatly in value, Pierce would have lost money by his purchase and Sullivan would have profited by the sale. We find nothing in the record to satisfy us that Sullivan should not be bound by his sale.

The court, we think, decided correctly in refusing to rescind the contract. The decree is affirmed.