[No. 9759. Department Two. November 24, 1911.]

## T. H. McMILLEN et al., Respondents, v. C. D. HILLMAN, Appellant.[1]

FRAUD—EVIDENCE—SUFFICIENCY. Actionable fraud on the part of the vendee in the sale of a steamboat is sufficiently established, where there was evidence that the vendee induced the vendors to take in part payment an assignment of a fictitious land contract, guaranteeing that $4,000 of the purchase money had been paid thereon, making representations well calculated to deceive and upon which the vendors relied, inquiry being prevented by the vendee's artifice.

APPEAL—PRESERVATION OF GROUNDS—EXCEPTIONS. In the absence of exceptions, error cannot be predicated upon the instructions.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered April 8, 1911, upon the verdict

[1]Reported in 118 Pac. 903.

of a jury rendered in favor of the plaintiffs, in an action for fraud. Affirmed.

*Frederick R. Burch (Milo A. Root,* of counsel) for appellant.

*Douglas, Lane & Douglas,* for respondents.

Ellis, J.—Action for damages for fraud and deceit claimed to have been practiced upon the respondents, plaintiffs below, by the appellant, defendant below, in connection with the sale of a steamboat by respondents to the appellant. The cause was tried to a jury, a verdict was returned for respondents, and from a judgment thereon, this appeal was prosecuted.

We find it necessary, briefly as may be, to review the evidence, which is sharply conflicting in many particulars. In the latter part of July, 1909, the respondents, who had built and were the owners of the steamer "Venus" and had been operating it upon Puget Sound, entered into negotiations with the appellant for the sale of the vessel to him. The selling price agreed upon was $16,000, which was some $6,000 less than it had cost to build the boat about two years before. Some talk was had as to respondents taking outside real estate in payment for the boat, but this they refused to do, and never at any time agreed to accept real estate of any kind, either in payment or part payment. They did agree, however, to accept $5,487 in money, $1,133 by the transfer of a certain land sale contract of the appellant with one Gagne, and the balance of $9,380 by the transfer of another land sale contract of appellant with an alleged John P. Martin, whose existence or nonexistence was one of the controverted questions at the trial. It was this Martin contract upon which the charge of fraud was based. It purported to be a contract for the sale by the respondent of certain tracts of land near Pacific City, in King county, aggregating about 16.25 acres, for the sum of $13,400, on which $2,020 had been paid at its date, April 21, 1909, and

$2,000 on July 21, 1909. The remaining installments, according to this contract, were $5,000 to fall due January 21, 1910, and $4,380 on July 21, 1910, with interest at the rate of eight per cent per annum, payable annually. The sale of the boat was consummated on July 30, 1909, the cash payment made, and the two contracts assigned by appellant to respondents.

The appellant, in the assignment, after reciting the above mentioned payments upon the Martin contract, and certain payment upon the Gagne contract, stated, "I further guarantee that said payments above mentioned upon said contracts have in fact been paid." This guaranty was inserted upon the request from respondents for assurance upon that point. The land covered by these contracts was also conveyed to respondents in order, as the evidence shows, to enable them to carry out the contracts and convey the land when fully paid for. The appellant testified that he personally negotiated the sale to Martin at Pacific City, on the date of the contract; that he received at that time the $2,020 in money, which the man Martin took from his pocket and paid to him in the place of business of one H. B. Cook, and that Cook was then conducting a grocery store in Pacific City, Washington; that the appellant personally received the second $2,000 on July 21, 1909, also in cash from Martin. Cook testified that, on April 21, 1909, appellant introduced to him a Mr. Martin, in his store at Pacific City; that Martin and the appellant used his desk, and he saw Martin hand to appellant some money; that he, Cook, afterwards had some talk with Martin with a view to selling him wire with which to fence the land. Cook insisted that he was conducting the store at Pacific City in April, 1909. One Earnest Bateman, a cousin of the appellant and in his employ, testified that the appellant introduced to him a Mr. Martin in April, 1909, at Pacific City; that he was present when Martin paid some money to the appellant, and heard the "jingle" of money as it passed hands; that Cook was

then out of business, and that the transaction took place in the store of one Cox. Edward J. Manning, accountant for Hillman Investment Company, testified that the books of that concern showed that the payments on these contracts had been made by check; that he made the entry at Hillman's direction, but that the money never went through the office, either in the form of money or checks.

Appellant explains this by saying that the entry was made merely to keep track of the matter, and that he himself deposited the money in the bank. He testified that he never saw the man Martin, either before or after this transaction, never received any letter from him, made no inquiries regarding him, did not know where he lived at the time, and knew nothing about him at the time of the trial. One O. O. Rowland, a surveyor in the appellant's employ, testified that Hillman, in 1909, introduced to him a Mr. Martin, and that he talked with Martin in regard to the corners of the land included in this contract, pointing them out upon a map.

One Leonard C. Hargiss, who was in the appellant's employ as assistant cashier of the Hillman Investment Company in 1909, testified that, on April 21, 1909, when Hillman claimed to have made the sale to Martin, Hillman was not in the state of Washington, and did not return to this state till in the month of May; and the evidence of the respondent McMillen tends strongly to corroborate this. He testified that he called at Hillman's place of business several times in April, and was told by different employees that Hillman was in California, and that he finally found that Hillman had returned about May 10th. Hillman alone was called to rebut this testimony, and stated that he returned from California on April 9th, 1909. Hargiss further testified that the Martin contract was written up in its entirety in the latter part of July, 1909, by S. B. Smith, cashier of the Hillman Investment Company; that he and Smith signed it as witnesses; that it was a "dummy" contract, made for the sole purpose of turning in on the purchase price of the boat; that he

never saw the man Martin; that he, on Smith's request, signed as a witness and made the endorsement of the $2,000 payment on the contract, Smith suggesting that it would look better in his handwriting; and that Smith went into another room with the contract, and returning with it signed with the name John P. Martin, said, "That signature, you know who wrote it. Nobody could tell that, I guess." S. B. Smith, the other witness to the contract, testified that he wrote the contract and signed Hillman's name to it, but owing to the large number of contracts which he had written, he could not remember ever to have seen such a person as John P. Martin. He could not say whether the contract and the endorsements thereon were written at one and the same time, because, he said, "I really don't remember."

The respondents made a slight examination of a part of the land covered by the Martin contract, but the evidence shows conclusively that they knew little of land or land values, and that they were induced to take the contract by appellant's representation that it was a *bona fide* contract, and because of his assurance that Martin had already paid $4,020 upon the purchase price, they believed he would pay the balance. Respondent J. J. Griggs, when asked why he consented to take the Martin contract, testified:

"Why, because it was represented that there was about one-third, or quite a little portion had already been paid in, and to use their expression, it would be a cinch we would get the balance in the time specified in the contract, and would get part of it within six months and the other part within a year, the balance within a year."

There was much other testimony of this witness, and also of the respondent McMillen to the same effect. The evidence also shows that the respondents made diligent search for Martin and have been unable to get any trace of him or to find any one who ever knew such a man. The evidence as to the value of the land covered by the Martin contract is widely divergent. The appellant testified that in 1909 it

"was not worth quite $3,000 an acre, but was well worth $700 an acre, approximately worth what this man is paying for it." Other of appellant's witnesses placed the value all the way from $1,500 to $300 an acre, while the respondents' witnesses placed the value at from $100 to $150 an acre. The evidence is conclusive that the land is, for the most part, swampy and densely covered with timber and brush, and that it would cost from $200 to $250 an acre to clear it.

The issue of fraud and deceit presented by the evidence was submitted by the court to the jury with instructions upon the theory that the respondents had the right to assume that the Martin contract was a valid contract between actual parties, and that the payments had been made thereon as represented; that if, in fact, the contract was fictitious, and if, in fact, it was one of the inducements to the respondents, and they relied upon it as a *bona fide* contract in consummating the trade with appellant, by reason of his representations, then the conduct of the appellant in the premises would constitute fraud, for which the respondents would be entitled to recover in damages the difference between the reasonable value of the land and the balance due on the alleged contract. The instructions covered every phase of the evidence. No exception was taken to the court's ruling upon any point of law nor to any instruction given, hence the instructions are not reviewable here. The instructions made the law of the case, the evidence made the facts. It was the province of the court to declare the law, of the jury to determine the facts.

In any event, the court's view of the law was correct. If the appellant's representations as to this contract were false and made with the intention to deceive, and if, under the circumstances, they were reasonably calculated to deceive, and did deceive, the respondents and induce their acceptance of the contract, they constituted actionable fraud. 14 Am. & Eng. Ency. Law (2d ed.), p. 21.

The only question for our consideration, therefore, is, Was

the evidence of such a character as to sustain the verdict? It is contended that, under the evidence, there could be no recovery because the respondents had an opportunity to examine the land, and did make some examination of it. The appellant's conduct was well calculated to deceive, both as to the value of the contract and the value of the land. To the ordinary mind, the fact that a man of sufficient substance to do so had so recently paid over $4,000 upon a purchase price of over $13,000 for the land, would tend to induce a belief that the balance would be paid. It would also tend to disarm caution and cause a less careful examination of the land, and, to one not versed in land values, imbue the idea that the land was worth the price, or at least sufficient to be ample security for the unpaid balance. The respondents were not buying land, but a contract. Where inquiry is prevented by artifice, the actual success of the artifice should not avail as a defense to a charge of fraud. 14 Am. & Eng. Ency. Law (2d ed.), p. 123; Bigelow, Fraud, p. 524; *Rathbone, Sard & Co. v. Frost*, 9 Wash. 162, 37 Pac. 298.

While it is true, as argued by appellant, that courts will not make contracts for persons *sui juris*, nor relieve against the results of culpable credulity, it is none the less true that courts will insist upon an observance of common honesty by such persons in making contracts for themselves. That credulity is not *per se* culpable which assumes this attribute of common honesty in representations made by one party to a contract concerning matters touching the very existence of the subject-matter within his absolute knowledge and unknown to the other party.

"By the overwhelming weight of authority, ordinary prudence and diligence do not require a person to test the truth of representations made to him by another as of his own knowledge, and with the intention that they shall be acted upon, if the facts are peculiarly within the other party's knowledge or means of knowledge, though they are not exclusively so, and though the party to whom the representa-

tions are made may have an opportunity of ascertaining the truth for himself." 14 Am. & Eng. Ency. Law (2d ed), p. 120.

True, this court has said, in a case where the facts well warranted the language used, and quoted by the appellant:

"Parties must exercise ordinary business sense, and the faculties which are given to them for the purpose of transacting business; and they cannot call upon the law to stand *in loco parentis* to them in the ordinary transactions of business and their ordinary dealings with their fellow men." *Washington Central Imp. Co. v. Newlands,* 11 Wash. 212, 39 Pac. 366.

See, also, *Pigott v. Graham,* 48 Wash. 348, 93 Pac. 435, 14 L. R. A. (N. S.) 1176; *Griffith v. Strand,* 19 Wash. 686, 54 Pac. 613. But this court has also said, where likewise the facts warranted the words:

"Where it is to the court perfectly plain that one party has overreached the other, and has gained an unjust and undeserved advantage which it would be inequitable and unrighteous to permit him to enforce, we do not believe that a court of equity should hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness. It is well known that many good people, and people of average or greater intelligence, are sometimes duped and misled by the skill, cleverness, and artifices of those who are adepts in the matter of deceiving their fellow men; and courts should not throw about schemers of this kind a protection that will tend to encourage the practice of their arts." *Stone v. Moody,* 41 Wash. 680, 84 Pac. 617, 5 L. R. A. (N. S.) 799.

See, also, *Wooddy v. Benton Water Co.,* 54 Wash. 124, 102 Pac. 1054, 32 Am. St. 1102; *Bailie v. Parker,* 56 Wash. 353, 105 Pac. 834; *Lindsay v. Davidson,* 57 Wash. 517, 107 Pac. 514; *Best v. Offield,* 59 Wash. 466, 110 Pac. 17, 30 L. R. A. (N. S.) 55; *Simons v. Cissna,* 52 Wash. 115, 100 Pac. 200; *Tacoma v. Tacoma Light & Water Co.,* 17 Wash. 458, 50 Pac. 55; *State v. Knowlton,* 11 Wash. 512, 39 Pac. 966; *McMullen v. Rousseau,* 40 Wash. 497, 82 Pac. 883.

The foregoing cases make it plain that this court is in accord with the trend of authority in holding that elementary morality should be observed in the making of contracts, even though the complaining party be unsuspicious and fail to exhaust every possible means of detecting the falsity of representations concerning matters peculiarly within the knowledge of the other party. Mere lack of suspicion will not be branded by the courts as a greater fault than deceit.

The following vigorous language is quoted with approval by this court from *Strand v. Griffith*, 97 Fed. 854, in *Wooddy v. Benton Water Co., supra:*

"There is no rule of law which requires men in their business transactions to act upon the presumption that all men are knaves and liars, and which declares them guilty of negligence, and refuses them redress, whenever they fail to act upon that presumption. The fraudulent vendor cannot escape from liability by asking the law to applaud his fraud and condemn his victim for his credulity. 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' "

See, also, *Stewart v. Wyoming Cattle Ranche Co.*, 128 U. S. 383; *Schumaker v. Mather*, 133 N. Y. 590, 30 N. E. 755; *Burns v. Dockray*, 156 Mass. 135, 30 N. E. 551.

In the case before us, the evidence as to the fraud was amply sufficient to sustain the verdict. The appellant complains of the court's instructions as to the measure of damages, but as no exception was taken to the giving of that or any other instruction, the verdict of the jury is conclusive.

The judgment is affirmed.

DUNBAR, C. J., CROW, and MORRIS, JJ., concur.