[No. 10140.   Department Two.   July 17, 1912.]

E. A. SHORES *et al., Appellants,* v. ERNEST HUTCHINSON
*et al., Respondents.*[1]

CORPORATIONS—SALE OF STOCK—RESCISSION BY PURCHASER—FRAUD
—EXPRESSION OF OPINION—EVIDENCE—SUFFICIENCY.   The evidence is
insufficient to warrant a rescission of the sale of stock for fraud-
ulent representations respecting its value, notwithstanding expres-
sions of the seller's opinion that the stock was worth what it had
brought at recent sales, and statements from the books showing
overvaluation of goods on hand, where it appears that the parties
were dealing on equal footing, that before the deal was closed, the
purchaser, with ample opportunity and actual knowledge, made his
own investigation, disregarded advice of the officers, attended several
meetings of the stockholders held in an endeavor to raise a large
working capital, upon which every one understood the fate of the
enterprise depended.

Appeal from a judgment of the superior court for Pierce
county, Easterday, J., entered August 30, 1911, dismissing
on the merits an action for rescission, after a trial to the
court.   Affirmed.

*Gordon, Easterday & Askren,* for appellants.

*Bates, Peer & Peterson,* for respondents.

ELLIS, J.—This is an action by E. A. Shores and wife,
against Ernest Hutchinson and wife, to set aside a transfer
and conveyance by plaintiffs to the defendants of certain im-
proved lots in the city of Tacoma, with the household furni-
ture therein, certain timber lands in Thurston county, and
certain standing timber in Jefferson county, made in exchange
for three hundred twenty shares of the capital stock of Mich-
igan Furniture Company, hereinafter called the company.
The company had a capital stock of $150,000, divided into
1,500 shares, of a par value of $100 each.   Twelve hundred
and fifty-five shares, of an aggregate par value of $125,500,

[1]Reported in 125 Pac. 142.

had been issued.    The grounds upon which rescission is
sought are alleged fraudulent representations by the defend-
ants as to the amount and value of the assets of the corpora-
tion and as to the value of the stock, and misrepresentation
and concealment as to the extent of its liabilities.    A trial
on the merits resulted in a dismissal of the action.    The
plaintiffs have appealed.

The evidence is voluminous and conflicting.   No good pur-
pose would be served by reviewing it in detail.   It will suffice
to say that, upon a careful consideration of the statement of
facts, we are satisfied that the following facts were estab-
lished by a fair preponderance of the evidence.    In the latter
part of January or early in February, 1911, the respondent
Ernest Hutchinson, who had recently retired from the presi-
dency and management of the company, desiring to dispose
of his stock therein, placed it in the hands of the real estate
firm of Fettig & Busselle for sale, advising them to call upon
the appellant E. A. Shores, who, as it appears, had formerly
evinced some interest in the concern.   After considerable nego-
tiation, which was conducted mainly, if not wholly, by these
agents with the appellant E. A. Shores, an agreement was
reached by which the three hundred and twenty shares of
stock were to be transferred to the appellants in exchange
for the property sought to be recovered in this action.

A contract evidencing this agreement was executed by the
appellants and respondents on February 16, 1911.   It pro-
vided that, if the respondents, within thirty days from the
date of the contract, deliver to the appellants the three hun-
dred and twenty shares of stock duly and regularly issued
to E. A. Shores, the appellants would thereupon deliver their
deeds of the property to the respondents.   The respondents,
at the time of the signing of the contract, delivered the stock
to the appellants' attorney, and on February 18, 1911, it
was transferred to the appellant E. A. Shores upon the books
of the company.   The stock certificate was actually delivered
to Shores personally, about March 10, 1911.   While he tes-

tified in effect that he did not consider himself the owner of
the stock until he delivered to respondents deeds of the prop-
erty, on March 14, 1911, it is undisputed that, between the
making of the contract, February 16, and the date of the de-
livery of the deeds to the respondents, March 14, he attended
several meetings of the stockholders, and was recognized by
the company as the owner of the stock. At these meetings it
appears that the affairs of the company were fully discussed,
and at one of them, held on March 11, 1911, a detailed state-
ment of its financial condition was read, showing that $30,000
was immediately required to keep the company a going con-
cern, and the appellant E. A. Shores was then appointed as
a member of a committee to devise some plan for financing
and reorganizing the company. He also attended an ad-
journed meeting of the stockholders on March 14, 1911, be-
fore delivering the deeds, at which meeting a motion was car-
ried to endeavor to get each stockholder to pay a 30 per cent
cash assessment, or put up 50 per cent of his stock for the
purpose of raising operating capital. In the latter part of
February, 1911, Shores went out to the plant and had a con-
versation with one Bradner, the manager of the factory, in
which the management, condition, and prospects of the com-
pany were discussed, and Shores then told Bradner that the
company ought to have $20,000 at once; thus showing that
he then realized that the concern was in immediate need of
working capital to make it pay and to preserve a value in the
stock. There was also evidence that both Shores and his son
visited the plant and looked over the goods and materials on
hand, and that Shores and his attorney made an examination
of the stock books and records of the company. While it ap-
pears that, prior to the transfer of the stock on February 18,
the officers of the company declined to give Shores informa-
tion and discouraged the purchase of the stock, after that
time they accorded to him every opportunity to examine the
books and look into the affairs of the company. There was
also evidence that the then president of the company,

and certain other stockholders advised Shores not to purchase the stock. He seems to have entertained the idea that these persons were trying to depreciate the stock in order to purchase it at a low figure themselves, and that their advice merely whetted his determination to become a stockholder.

We fail to find that either the respondent Hutchinson or his agents Fettig and Busselle made any representations as to the value of the stock or as to the affairs of the company which could have reasonably misled the appellants as to what they were trading for, or as to its worth. Shores testified that Hutchinson told him some of the stock had been sold for ninety cents a share, and that it was worth that. While it seems to be admitted that either Hutchinson or his agents did tell Shores that stock had been sold recently at that figure— which was true—Hutchinson, Busselle and Fettig all testified that no representation was made at any time by any of them as to the actual value of the stock. They testified that, at the time of the signing of the contract on February 16, 1911, Busselle told Shores that they placed no value on the stock because they did not know what it was worth, and that Shores answered in effect that he did not want any information from them, as he preferred to get his information "first handed."

Certain balance sheets and statements of bills payable came into Shores' hands pending the negotiations. He claims that these were given to him by Hutchinson as representing the actual cash valuations of the property, accounts, and debts of the company. The evidence is by no means plain that any of these were furnished to him by Hutchinson or his agents, but it is plain that some of them were secured by him at the meetings of the company which he attended. In any event, they were what they purported to be—mere statements made from the books of the company, and there was no evidence that they were not true statements of what the books showed. While some of these statements probably showed values in excess of the actual value of the goods on hand, we cannot believe, in view of the investigations shown to have been made

by Shores and the knowledge of the actual financial condition
of the company which was brought home to him prior to the
closing of the transaction by the delivery of the deeds, that
he was actually deceived by them or delivered his deeds on
the faith of what these statements showed.   It is true that
the company was placed in the hands of a receiver just one
month after the appellants delivered their deeds in exchange
for the stock, but it seems plain that the appellants knew, or
ought to have known, when the deeds were delivered, that this
result would follow unless the plans then pending for reor-
ganization and raising a working capital were successful.
Every one concerned, including the appellants, knew that the
fate of the enterprise depended entirely upon the raising of a
large working capital.   With this knowledge, the appellants
closed the deal and delivered their deeds.

Even if we accord absolute verity to the appellants' testi-
mony as to the representations alleged to have been made by
Hutchinson, they must be treated, in view of the relation and
situation of the parties, as mere expressions of opinion, not
constituting ground for rescission.   No confidential or fidu-
ciary relation between the parties existed.   They were deal-
ing with each other at arm's length.   The means of knowledge
were open to the appellants.   No artifice of any kind was em-
ployed to prevent them from availing themselves of these
means to acquire full knowledge.

"To make representations fraudulent and therefore ground
for a rescission they must be representations of material facts
and not mere matters of opinion or judgment.   In law one
man's judgment or opinion is as good as that of another.
It would be folly in a person to implicitly confide in the state-
ments of another where both have equal means of informa-
tion."   Smith, Law of Fraud, p. 143, § 126.

"As a generalization from the authorities, the various con-
ditions of fact and circumstance with respect to the question
how far a party is justified in relying upon the representation
made to him may be reduced to the four following cases, in
the first three of which the party is not, while in the fourth
he is, justified in relying upon the statements which are of-

fered as inducements for him to enter upon certain conduct: 1. When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement; 2. When, having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence; 3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties; 4. But when the representation is concerning facts of which the party making it has, or is supposed to have, knowledge, and the other party has no such advantage, and the circumstances are not those described in the first or the second case, then it will be presumed that he relied on the statement; he is justified in doing so." Pomeroy, Equity Jurisprudence (3d ed.), § 892.

In the case before us, the appellants not only had the means of knowledge, but had actual knowledge of the necessitous condition of the company before finally consummating the trade. Manifestly the case does not fall within the fourth class designated by Pomeroy, so as to give ground for rescission.

It is also manifest that the appellants cannot be heard to say that they relied upon any representations made by the respondents or their agents. They entered upon an independent investigation, and there is no evidence that they were prevented from pursuing it by any act of the respondents or of their agents. In fact, if Fettig and Busselle are to be believed, when they offered to assist Shores in securing information, he declined their aid, intimating that he preferred to secure it for himself. All of this was while the contract of exchange was still executory, and before the appellants had delivered their deeds.

"If, after a representation of fact, however, positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must

plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences or purports or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled." Pomeroy, Equity Jurisprudence (3d ed.), § 893.

See, also, Smith, Law of Fraud, § 75; 20 Cyc. 92; *Slaughter's Adm'r v. Gerson*, 80 U. S. 379. The rule announced by the foregoing authorities is exemplified in the following decisions by this court: *Washington Cent. Imp. Co. v. Newlands*, 11 Wash. 212, 39 Pac. 366; *English v. Grinstead*, 12 Wash. 670, 42 Pac. 121; *Griffith v. Strand*, 19 Wash. 686, 54 Pac. 613; *Walsh v. Bushell*, 26 Wash. 576, 67 Pac. 216; *Opie v. Pacific Inv. Co.*, 26 Wash. 505, 67 Pac. 231, 56 L. R. A. 778; *Pigott v. Graham*, 48 Wash. 348, 93 Pac. 435, 14 L. R. A. (N. S.) 1176; *Romaine v. Excelsior Carbide & Gas Machine Co.*, 54 Wash. 41, 103 Pac. 32.

That we have gone as far as other courts in sustaining the right of aggrieved parties to rescind or claim relief against contracts induced by fraudulent representations, where there is evidence of abuse of some confidential or fiduciary relation, or where the parties are not upon an equal footing, or where the means of knowledge are not equally open to both, or where some reasonably sufficient artifice has been employed to prevent investigation, or where it is made evident that in any other way an unfair and unconscionable advantage has been taken of the complaining party, is demonstrated by the following and many other decisions: *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054, 132 Am. St. 1102; *Bailie v. Parker*, 56 Wash. 353, 105 Pac. 834; *Lindsay v. Davidson*, 57 Wash. 517, 107 Pac. 514; *Best v. Offield*, 59 Wash. 466, 110 Pac. 17, 30 L. R. A. (N. S.) 55; *Jones v. Hawk*,

64 Wash. 171, 116 Pac. 642; *McMillen v. Hillman*, 66 Wash. 27, 118 Pac. 903.

We have, however, never gone so far as to sustain a rescission or grant other relief merely because the expectations of one of the parties have not been realized, where the parties, as here, were dealing at arm's length, where the means of knowledge were equally open to both, where an independent investigation was actually undertaken by the complainant, where no artifice was employed to prevent its prosecution, and where the evidence of the alleged fraudulent representations was contradicted by evidence which, so far as we can know, was equally credible. It is familiar law that one asserting fraud must establish it by clear and convincing evidence. A careful consideration of the whole record impels us to the conclusion that the decision of the trial court is sustained by a preponderance of the evidence.

The judgment is affirmed.

MOUNT and MORRIS, JJ., concur.