[No. 14465. Department Two. October 16, 1918.]

STANDARD LUMBER COMPANY, *Respondent,* v. DEER PARK LUMBER COMPANY *et al., Appellants.*[1]

VENDOR AND PURCHASER (150) — REMEDIES OF VENDOR — ACTIONS FOR PURCHASE MONEY—DEFENSES—DEFECT IN QUANTITY. In an action for balance due on the purchase price of timber lands, mill and other property, defendant cannot claim a deduction for a shortage in the estimated quantity of 25,000,000 feet of white pine, where the quantity was not guaranteed and the vendees started their own cruise, which indicated to them a shortage before the contract was entered into.

SAME (156) — REMEDIES OF VENDOR — ACTIONS FOR PURCHASE MONEY—AMOUNT OF RECOVERY. Where there was a sale in gross of timber lands, mill and other property, which was to be paid for by the deduction of the debts of the vendor and $10,000 paid by the vendees, and balance in preferred stock with interest without specifying any time for delivery, in an action for the price upon the vendees' default and refusal to deliver any stock, the vendor is entitled to a judgment in entirety for the balance due payable at once, instead of judgment for future payments evidenced by obligations of the defendant.

Cross-appeals from a judgment of the superior court for Spokane county, Sullivan, J., entered April 16, 1917, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Modified.

*Graves, Kizer & Graves,* for appellants.
*Post, Avery & Higgins,* for respondent.

[1]Reported in 175 Pac. 578.

PER CURIAM.—Plaintiff, of which W. H. Short was president and principal stockholder, owned about 13,000 acres of timber land, a short logging railroad, brick yard, and a sawmill with appurtenances, located near Deer Park, Washington. It was indebted in excess of $345,000 and had been seeking a purchaser for some time. In the latter part of 1913, plaintiff and defendants were brought in touch with each other, and early in January, 1914, defendants went to Deer Park. They were met by plaintiff's president, who took them in a sleigh through the timber land lying to the north of town the first day, and to the south of town the next day. Previous to this trip, statements of the assets of plaintiff had been given or shown to the defendants. At the head of these statements was "25,000,000 feet white pine @ $4.00—$100,000." Negotiations continued, and finally defendants took an option for the purchase of the property good until March 5, 1914.

Late in January, 1914, defendants sent a cruiser into the woods, who spent several weeks cruising under unfavorable weather conditions, and in the latter part of February, 1914, came to Spokane and gave defendants a report on that which he had cruised. The report indicated a shortage of about 4,000,000 feet of white pine and that about one-half of the tract had been cruised. This shortage was called to Short's attention. It is claimed that he asserted that there was the full quantity of pine, and that weather conditions were then so bad that no cruiser could do accurate work, and that, if there were any shortage in the tracts just cruised, it would be made up on the other parts, which were sure to overrun his estimate. Short assured them that there were 25,000,000 feet on the tract, but denied that he made any guaranty or urged that the deal be

quickly closed, and stated that they could have all the time they wanted for making cruises, but that the price then agreed upon was the lowest price he would take, and that they could either take the property at that price or leave it alone. The defendants continued the cruise, but claim that they received no further report on same, although they met their cruiser on March third. They could have received daily reports from him by mail. Under these conditions, defendants entered into the following contract, on or about March 5, 1914, omitting formal parts:

"(1)   Witnesseth: That said vendor does hereby agree to sell and convey unto said vendees, and that said vendees do hereby agree to purchase of said vendor, all the real estate situate in Spokane and Stevens counties, state of Washington, which is designated in green in the annexed plat marked 'Exhibit A' and hereby made a part of this contract, including all that part of section thirty-four (34), township twenty-nine (29) north, range forty-two (42), E. W. M., upon which said mill is situate and used for mill purposes, being about one hundred twenty (120) acres, and which said real estate is to be fully described by government subdivisions and the description thereof to be hereto attached as a part hereof; also all timber standing upon the real estate described in the list hereto annexed, marked 'Exhibit B' and hereby made a part of this contract; the entire sawmill, planing mill, dry-kiln and brickyard situate and standing upon section thirty-four (34), township twenty-nine (29) north, range forty-two (42), E. W. M., at Deer Park, Washington, including all equipment used in connection therewith and all on hand at this time; the railroad known as Deer Park Central, and railroad equipment complete, sidetracks and log-dock; also all wagons, horses, harness, sleighs, logging tools, camp, camp outfit, two extra motors, and all personal property used in connection therewith and thereon, and also the contract to supply the town of Deer Park with water, except office fixtures and supplies, accounts and bills receivable,

swinging crane, traction engine and traction log-wagons, and one bay driving horse called 'Dolly'; also to convey all hay and feed located in the barn of said vendor standing upon section three (3), township twenty-eight (28), north, range forty-two (42), E. W. M., and at the camp, on section fifteen (15), township twenty-nine, (29), north, range forty-two (42), and the right to use said barn until September 1, 1914.

"(2)   The purchase price of all of said property except the lumber and logs is the sum of four hundred nineteen thousand four hundred forty-five dollars ($419,445).   For the logs situate in the mill-pond at Deer Park said vendees are to pay the following prices per thousand: tamarack and fir $5.50; western pine $6.50; white pine, $8, less $1 per thousand on sinkers as scaled during October, 1913; for all logs banked on the Deer Park Central the same rate as above, less $1.50 per thousand; for all logs which have been cut and skidded but not delivered in pond or upon railroad vendees are to pay only $1.75 per thousand.   There should be deducted as stumpage from said purchase price for all logs cut by said vendor since January 1st, 1914, the sum of $4 per thousand for white pine; $1.50 per thousand for western pine, and $0.50 per thousand for tamarack and fir, but no stumpage shall be deducted for logs which are cut and skidded in the timber; said logs to be scaled and the quantity thereof respectively to be determined on or before March 16th, 1914, by a competent scaler, disinterested as between the parties hereto.

"(3)   Said vendor shall retain possession of and operate said planing mill until June 1, 1914, and manufacture from lumber on hand and marked up to E. B. Foss & Company such white pine as shall be required to fill its contract with said company during said time, and also manufacture such western pine from the lumber marked up to the Washington Mill Company by numbers as shall be necessary to supply the lumber to said Washington Mill Company under its contract with said company during said time.   All lumber on hand other than that marked up to said E. B. Foss & Company and to said Washington Mill Company shall

be inventoried and said vendees shall pay the value thereof, said value to be ascertained by the contract price of rough lumber under which said vendor has agreed to sell like lumber to the Lakeside Lumber Company at Spokane, Washington, less the freight and less fifty cents (50c) per thousand for handling at Deer Park, Washington.

"(4) Vendees are to furnish vendor necessary power to operate said planing mill until June 1st, 1914, without charge therefor, and said vendor agrees to manufacture such lumber for said vendees as they shall order at the same prices as are included in said contract between said vendor and said E. B. Foss & Company, copy of which is to be furnished by the vendor. On June 1st, 1914, all the white pine remaining on hand marked up to said E. B. Foss & Company and all western pine remaining on hand marked up to said Washington Mill Company shall be inventoried by the vendor and vendees, and said vendees shall pay for the Foss & Company lumber to said vendor the contract price with said Foss & Company, less seventy-five cents (75c) per thousand for handling, and for said Washington Mill Company lumber the contract price fixed with said Mill Company, less fifty cents (50c) per thousand for handling. It is further agreed that said vendor guarantees the grades as marked upon the said lumber to be correct and that in case it shall be found that any portion thereof falls below the grade as marked on each pile, then said vendor shall make good the same to said vendees, and in case the grade shall be better than marked, then said vendees shall make the same good to said vendor.

"(5) Said vendees have this day paid to said vendor to apply upon the purchase price of said property the sum of ten thousand dollars ($10,000). The balance of said purchase price shall be paid as follows:

"(6) Said vendees shall have twenty (20) days in which to form a corporation with a capital stock of one hundred thousand dollars ($100,000) common stock and two hundred thousand dollars ($200,000) preferred stock. From said purchase price shall be deducted the debts of said vendor existing on the 16th

day of March, 1914, amounting to not to exceed three
hundred forty-five thousand dollars ($345,000);
also the ten thousand dollars ($10,000) this day paid
by said vendees to said vendor and for the balance of
the purchase price said vendor shall receive preferred
stock of said corporation to be formed as aforesaid, at
par value, bearing interest at the rate of eight per cent
per annum, payable annually, out of the net profits of
the business of said corporation, the principal to be
paid at the end of ten (10) years after date, said pre-
ferred stock to provide that any part of the same may
be paid at any interest paying period, provided said
corporation so to be formed shall, sixty (60) days prior
to said date, give notice in writing of its election to pay
the same, by paying the par value with accrued interest.
The dividends upon the preferred stock shall be cumu-
lative and at the time of the issuance and delivery to
said vendor of said preferred stock said corporation
shall enter into a written agreement with said vendor,
whereby it shall agree that no dividends upon the com-
mon stock of said company shall be declared until the
preferred stock which is issued to said vendor shall
have been fully paid.

"(7)   For the purchase price of the balance of the
lumber on hand June 1, 1914, marked up to E. B. Foss
& Company and the Washington Mill Company, a note
shall be given by vendee to vendor, due nine (9) months
after date, bearing interest at the rate of six per cent
per annum.

"(8)   It is understood and agreed between the par-
ties hereto that said vendor holds a contract from W.
C. Ufford and wife for a portion of said described real
estate; also some contracts for portions of other real
estate from the state of Washington; one contract from
A. M. Thomas and wife for some of the said real estate
and a contract from Nancy Alberthal and husband for
two hundred (200) acres of said land; that said con-
tracts shall be assigned by said vendor to said cor-
poration so to be formed, and a good and sufficient con-
veyance made by said vendor to said corporation of all
other of said real estate and personal property and de-
livered to it simultaneously with the issuance and de-

livery of said preferred stock by said corporation to said vendor. Said vendor agrees to furnish abstracts of title to all of said real estate showing good merchantable title, and in case the title to any of the real estate shall be found defective, then said vendor shall have a reasonable time in which to perfect said title. Deeds for all lands held in fee simple to contain full covenants of warranty.

"(9)   It is further agreed that W. H. Short, B. Lewis, E. Enoch and B. A. Hopkins, present stockholders of said vendor, shall, at the time of said conveyance, enter into a written agreement with said corporation so to be formed, agreeing not to at any time, directly or indirectly, personally or for any other person or corporation, enter into the lumbering business at Deer Park, Washington, or at any point within twenty (20) miles thereof, for the term of fifteen (15) years from March 16, 1914.

"(10)   Said vendor also agrees to convey to said corporation so to be formed all contracts for rights-of-way for said railroad which it now has without further consideration, said corporation to assume the balance due therefor; also grant to said corporation a right-of-way not to exceed one hundred (100) feet in width over and across section three (3) and the west half of the southwest quarter (W½ of SW¼) of section nine (9), all in township twenty-eight (28), north, range forty-two (42), E. W. M., the center line of which shall be surveyed by said corporation during the year 1914; said corporation to pay for the right-of-way over section three (3) at the rate of one hundred twenty-five dollars ($125) per acre, and nothing in addition thereto for the right-of-way over the west half of southwest quarter (W½ of SW¼) of said section nine (9).

"(11)   The obligations of said vendor to E. B. Foss & Company and Washington Mill Company under the 1913 contracts with said parties shall not be assumed by said vendees until June 1st, 1914, when, if said remaining obligations exceed the amount of lumber then remaining from that marked up to said Foss & Company and said Washington Mill Company, the balance due shall be assumed by said new corporation and said

vendor shall surrender preferred stock held by it to that amount.

"(12)   The orders for lumber received by said vendor on or before March 16, 1914, shall, on said day, be turned over to said vendees.

"(13)   It is understood between the parties hereto that this contract includes only the saw-timber down to and including eight-inch tops on section seven (7), township twenty-eight (28), north, range forty-two (42), and section eleven (11) and thirteen (13), township twenty-eight (28), north, range forty-one (41), and only the pine timber on south half (S½) of southeast quarter (SE¼), section sixteen (16), township twenty-nine (29), north, range forty-two (42).

"(14)   It is further agreed that said vendor shall obtain from the Netherlands American Mortgage Bank an extension of time until April 1, 1915, in which to remove the timber from section seven (7), township twenty-eight (28), north, range forty-two (42) and section eleven (11) and thirteen (13), township twenty-eight (28), north, range forty-one (41), said vendees agreeing to haul the wood on its railroad to Deer Park at thirty-five cents (35c) per cord.

"(15)   It is further agreed between the parties hereto that the real estate agreed to be conveyed herein has been figured at five dollars ($5) per acre, exclusive of the timber, and has been figured at twelve thousand nine hundred ninety (12,990) acres. In case it shall not amount to that number of acres, then a proportionate reduction at that rate shall be made from the purchase price."

Plaintiff brought this action to recover the balance of the purchase price for the property sold by them to the defendants under the foregoing contract. A large shortage in the represented quantity of white pine timber and various items in dispute were pleaded by defendants in reduction of the amount claimed. Judgment was rendered for plaintiff upon findings made by the trial judge. The defendants have appealed and the plaintiff has cross-appealed. We there-

fore designate the parties as plaintiff and defendants.

Defendants make seven assignments of error which they have discussed under four heads: white pine shortage; 1913 Foss contract; 1914 Foss contract; and drop in grade and difference in prices of lumber.

I. White pine shortage: Defendants claim there is a considerable shortage of the 25,000,000 feet white pine estimate or representation. The option contained a gross price of $462,820, which was reduced some $40,000 at the execution of the contract. All state-ments, oral agreements and differences must have merged in the written contract at the execution thereof. It was a contract in gross as to the property and tim-ber, except as to logs cut and lumber then manufac-tured, for a gross sum of $419,445. The clause follow-ing the real estate description, "Also all timber stand-ing upon the real estate described in the list hereto annexed," does not designate any particular kind or quantity of timber sold, but all the timber standing on the real estate. Under defendants' theory we would be obliged to read something into the contract which is not there, or we would be obliged to reform it. A reformation of the contract is not at issue here. The defendants had nearly completed the cruise at the time of the execution of the contract. If they were not satisfied with the showing of the cruise, it would have been a simple matter to have inserted a guarantee of 25,000,000 feet white pine with an abatement clause as to price for a less quantity, as they did with the real estate, if such was the agreement.

In urging their case here, learned counsel assume and invite the court to hold that the sole inducement for the trade on the part of plaintiff was that there was 25,000,000 feet of white pine stumpage, and that, if the representation, if it be so called, is not sustained, they are to be relieved of the burden of the contract.

But the law must take a broader view of the trans-
action. It will consider the motive of the plaintiff as
well as the motive of the defendant. Plaintiff had an
established property. In a sense it was not a severable
property. It was deeply in debt. We take it from the
whole record that its object was to secure enough
money or available credit through the intervention of
a sale to relieve itself of its pressing necessities and a
burden which might overcome it in the end. This is
evidenced by the fact that there was but $10,000 in
money to be paid to the plaintiff in the transaction.
And giving consideration to the situation and purpose
of the plaintiff, as well as the situation and purpose of
the defendants, and considering the whole transaction
in the light of the option and the written contract,
which was made at a time when defendants knew, or
might have known through their own agents, the exact
amount of white pine, it follows that defendants can-
not recover without disregarding established rules of
law and principles of equity which have come to be
as inflexible as the law.

The judgment of the court below follows the con-
tract. We cannot say that that contract was not the
contract of the parties and write into it the qualifica-
tion that this is the engagement of the parties only in
the event that it is found hereafter that there is in
fact 25,000,000 feet of white pine upon the land. We
do not understand that courts can relieve a party to
an improvident contract without reforming it upon
some proper ground of reformation. It was not al-
leged that there was any fraudulent design or mutual
mistake, or that defendant had no means of protecting
himself from a misrepresentation, if made, or that the
property was far distant and for that reason could
not be investigated, or that plaintiff discouraged an
independent investigation, or that defendant had no

technical knowledge of the business of cruising lands, or any other ground that has heretofore been recognized as sufficient to sustain a rescission or reformation, either in part or in whole.

The defendants were bright young men, and the father of one of the defendants had brought an attorney from Helena, Montana, to protect their interests. An attorney from Spokane represented both parties in drafting the contract, which had been redrafted three times before execution. Even though the 25,000,000 feet white pine representation induced the purchase, it is plain that defendants did not rely upon plaintiff's representation, because they made an independent investigation by sending their cruiser to cruise the timber, who had nearly completed the cruise at the time of the execution of the contract. In *Shores v. Hutchinson*, 69 Wash. 329, 125 Pac. 142, the court said: "It is also manifest that the appellants cannot be heard to say that they relied upon any representation made by respondents or their agents. They entered upon an independent investigation and there is no evidence that they were prevented from pursuing it by any act of respondents or their agents." Defendants had knowledge that the white pine would run far short of the 25,000,000 feet estimate previous to the execution of the contract, according to their cruiser's report, and cannot now complain that the guaranty of such quantity, under a stipulated system of measurement, was not incorporated in the contract. Cruisers' estimates are often unreliable, varying from ten to fifty per cent, and cannot be considered as binding without such agreement. Evidently defendants were satisfied with the contract as it was drawn, when they signed it. At least they must be held to have been so satisfied.

Where there is a sale in gross, that is to say, where the contract considered the property as a whole with-

out any attempt to consider its elements, but for a total price, relief will not be granted for shortage where the purchaser has investigated and estimated the property before sale. We cannot hold that the defendants relied on plaintiff's representation, under the circumstances of defendants' investigation and estimation of the property, although we should hold a misrepresentation had been made. The representation must be relied on, for otherwise it does not deceive, and hence does not constitute fraud. *Sullivan v. Pierce,* 125 Fed. 104.

The trial court's findings No. 12, relating to value of white pine timber stumpage, and finding No. 13, to white pine shortage, were unnecessary for the judgment rendered and may be considered stricken.

II.  1913 Foss contract:  Plaintiff alleges that the defendants refused to proceed with the 1913 contract after June 1, 1914, and that the plaintiff was therefore compelled to, and did, continue to carry out such contract, and that in so doing it was damaged. The trial court allowed them $1,523.20, being the aggregate of the commission item of $1,139.45, and the insurance item of $383.75. We think this was error. In any event, if the defendants had proceeded under the contract, this amount, under the contract, would have been charged to the plaintiff finally. Thus it will be seen that the court erred in its finding No. 6 and in finding No. 20 debiting defendants with $1,523.20 damages on the 1913 Foss contract, and crediting them with "drop in grade of lumber inventory covered by 1913 contract $2,683.64," which items should be stricken, there being nothing to support them.

III.  1914 Foss contract:  We find, in referring to the contract, paragraph 2, that lumber and logs are excepted from the $419,445 and that a separate and distinct price was provided, and the trial court cor-

rectly found the logs to be of the value of $16,098.44, and that Foss & Company had advanced to plaintiff $17,203.90, with interest, on these logs. Defendants, in assuming this obligation, are therefore entitled to a credit of $1,105.46 and a difference of $65.81 interest against plaintiff, or making a debit of $16,098.44 and a credit of $17,269.71. Defendants claim that these logs were included with the other property, and that $17,203.90 with $65.81 interest on Foss indebtedness should be considered as a part of the $345,000 indebtedness mentioned in the contract, but we do not think so. This indebtedness was to be paid by the lumber sawed from the logs, while the $345,000 indebtedness was to be paid in money. This, however, is immaterial as to the outcome, if we conclude to give a money judgment in entirety.

IV. Drop in grade and price of lumber: There was in plaintiff's yard, at the time the contract was made, a quantity of fir and larch lumber on which no advances had been made and against which there was no other lien except the general lien of all of plaintiff's indebtedness. This lumber was purchased by defendants, to be inventoried and to be paid for at such price as plaintiff had agreed to sell like lumber to the Lakeside Lumber Company, less freight and fifty cents per thousand handling charges. Defendants' main contention is in regard to the grades, and claim that it ought to have been graded as No. 3 and better, instead of Nos. 1, 2 and 3, because the lumber was all intermingled in the piles and that they would have to sell it as No. 3; but we believe that separation can easily be made at the time of shipment, and think the trial court was right on this proposition. This brings us to plaintiff's appeal.

Its assignment of errors are: (1) That the amount of judgment should be $97,828.26 and interest; (2) that

plaintiff is entitled to a money judgment for the amount found payable at once, instead of a judgment providing that a part thereof shall be payable in the future and evidenced by obligations of the defendants of the form set out in the judgment. What we have already said will dispose of the first assignment, and we will, therefore, proceed with the second. The contract provided that from the purchase price shall be deducted the debts of the vendor existing not to exceed $345,000, also $10,000 paid by vendees, and for the balance of the purchase price the vendor shall receive preferred stock of the corporation to be formed by vendees, with interest at eight per cent, principal to be paid at the end of ten years, etc. No time was provided when this stock security was to be delivered. The trial court found that it was intended that this preferred stock was to constitute an absolute promise to pay such sum on March 6, 1924, with interest from March 6, 1914, at eight per cent per annum, payable annually out of the net profits of the business of the defendant corporation, and that no dividends should be paid on the common stock until this obligation had been fully paid. The defendants failed and refused to deliver any preferred stock or any evidence of indebtedness as provided in the contract.

Where property is sold, to be paid for at a future time, no suit can, as a general rule, be brought on the promise to pay until the time stipulated; but where the purchaser agrees to give security for the deferred payment, and fails to do so, a suit may be maintained for the breach of the agreement to give the security; and in such action the damages are the value of the security agreed upon—*prima facie,* the amount of the sum to be secured. *Rinehart v. Olwine,* 5 Watts &

Serg. (Pa.) 157; *Hanna v. Mills*, 21 Wend. (N. Y.) 90, 34 Am. Dec. 216; *Barron v. Mullin*, 21 Minn. 374.

For the breach of an agreement to execute a promissory note payable in the future, damages may be recovered presently, and the amount for which the note was to be given will be the *prima facie* measure of such damages. *American Manufacturing Co. v. Klarquist*, 47 Minn. 344, 50 N. W. 243; *Deering v. Johnson*, 86 Minn. 172, 90 N. W. 363; *Bowman v. Branson*, 111 Mo. 343, 19 S. W. 634.

We are of opinion that plaintiff was entitled to a money judgment in entirety. We think that finding No. 20 should be changed to read as follows: That the balance owing to the plaintiff from the defendants is the sum of ($92,732.32) ninety-two thousand seven hundred thirty-two and 32-100 dollars.

In arriving at this figure, the defendants are charged with the following amounts:

| | |
|---|---:|
| Contract price for mill property, standing timber and real estate | $419,445.00 |
| Lumber inventory | 16,995.15 |
| Logs | 16,098.44 |
| Total | $452,538.59 |

Credit the defendants with the following:

| | |
|---|---:|
| Paid on contract, cash | $10,000.00 |
| Open account | 2,463.84 |
| 1914 Foss advancement with interest | 17,269.71 |
| Debts paid and assumed | 329,176.57 |
| Land rebate | 516.15 |
| Taxes on lumber, 1913, Foss contract | 380.00 |
| | $359,806.27 |
| Judgment | 92,732.32 |
| Total | $452,538.59 |

The written contract of conveyance provided that the evidence of indebtedness should bear interest at the rate of eight per cent per annum from the 6th day of March, 1914. The plaintiff will recover judgment for $92,732.32, with interest at the rate of eight per cent per annum from March 6, 1914, until paid.

For the foregoing reasons, the cause is remanded to the trial court for modification in conformity herewith. It is so ordered. Neither party will recover costs in this court.