[No. 12972.   Department One.   May 6, 1916.]

## PAUL WILSON et al., Appellants, v. E. W. MILLS et al., Respondents.[1]

VENUE—REAL PROPERTY—RESCISSION—LANDS IN TWO COUNTIES—
CHANGE OF VENUE. An action for the rescission of a trade of lands
located in M. county for lands in K. county is as much local to
K. county as to M. county where the action was brought, and it is
not error to grant a change of venue to K. county.

EXCHANGE OF PROPERTY—RESCISSION—MISREPRESENTATIONS—RELI-
ANCE. Where plaintiff, in an action for the rescission of a trade of
land for fraud, knew that representations in a memorandum de-
scribing the land were not literally accurate, he cannot be heard to
say that he relied upon them as being literally accurate.

SAME—FRAUD—EVIDENCE—SUFFICIENCY. In an action for the
rescission of a trade of lands, a rough sketch as to the course of a
river cannot be made the basis of actionable fraud, where it was
hastily made and only intended to represent the general course of
the river and must have been so understood.

SAME. Misrepresentations as to the boundaries of a tract of land
do not warrant a rescission, where a line was merely indicated from
a distance without any attempt to point out its exact location, and
no shortage was claimed.

SAME. In an action for rescission of a trade of lands, the burden
being upon the plaintiff to establish fraud in misrepresenting the
amount of bottom land in the tract, he is not entitled to recover
upon a showing that two surveys were made which were directly
conflicting and one showed the truth of the representations.

SAME. A rescission of a trade of lands for fraud in misrepre-
senting the character of the land is properly denied, where the evi-
dence as to the misrepresentations respecting the quality of the land
were directly conflicting, plaintiff examined the land, no artifice was
exerted reasonably calculated to prevent further examination, and
the parties dealt at arm's length and put in their respective proper-
ties at inflated trading prices.

Appeal from a judgment of the superior court for King
county, Smith, J., entered March 30, 1915, dismissing an
action for rescission, after a trial on the merits to the court.
Affirmed.

[1]Reported in 157 Pac. 467.

*W. H. Abel, A. M. Abel,* and *Farrell, Kane & Stratton,* for appellants.

*Turner, Hartge & Turner* and *Alexander & Bundy,* for respondents.

ELLIS, J.—Action to rescind an exchange of properties, on the ground of alleged fraudulent representations. Sometime in August, 1914, plaintiffs exchanged lots 4, 5, and 6, of block 1, Sturtevant's Rainier Beach Lake Park Cottage Tracts, in King county, subject to a mortgage for $3,500 and some interest, for two hundred acres of land in Chehalis, now Grays Harbor, county, and approximately forty-two acres in Mason county, owned by defendants. The two hundred acres was subject to a mortgage for $7,500 and some interest. The Mason county land, which was held under contract from the state, was subject to unpaid installments of the purchase price, amounting to $280 and some interest. In addition to the land, the defendants also contributed to the exchange thirty-eight cows, certain calves, horses, hogs, hay, oats, household furniture, tools, implements, etc. Plaintiffs, for the purpose of the trade, valued their King county property at $16,500, defendants assuming the mortgage on it. Defendants valued their land for the purpose of the trade at $28,000, plaintiffs assuming the indebtedness against it, giving a chattel mortgage for $3,500 to offset the mortgage assumed by defendants and paying the difference of $4,000 in money. The deeds were exchanged on August 21, 1914, and possession soon after. The land in Grays Harbor county consists of five forty-acre tracts four of which lie lengthwise abutting on the line between Grays Harbor and Mason counties, the fifth immediately west and the land in Mason county immediately east of the southerly of the four first mentioned forties.

Plaintiffs charge that defendants falsely represented that the Grays Harbor county land was distant, by the traveled road from Matlock, only four miles, and from Satsop, only

eight to ten miles; that all of the land in that county was bottom land, mostly first bottom, all with soil from three to four feet deep, not gravelly nor liable to erode; that only fifteen acres were in the bed of the Satsop river and that the river ran through only two of the forties; that the other three forties were wholly east of the Satsop river; that there was a fine strip of pasture land west of the river in the west forty; that the oat patches on the land contained sixteen acres; that the oat crop, which was then ready for harvest, would run from ninety to one hundred bushels to the acre; that there were then in the barn from one hundred to one hundred twenty tons of good hay; that the income from the thirty-eight cows was from $80 to $90 every two weeks; and that the lands were of as great fertility as Chehalis river bottom lands. It is alleged that plaintiffs relied upon these representations in making the exchange. All of these charges were put in issue by the answer. The action was originally commenced in Grays Harbor county, but, upon application of defendants for a change of venue, was transferred to King county for trial.

After a lengthy trial, and after the trial judge had examined the respective properties, a judgment was rendered dismissing the action upon its merits, neither party to recover costs. Plaintiffs appeal.

It is first urged that the court committed error in granting a change of venue. It is argued that, inasmuch as two hundred acres of the land were located in Grays Harbor county, under the doctrine announced in *Seymour v. LaFurgey*, 47 Wash. 450, 92 Pac. 267, the action was local and should have been tried in that county. This argument overlooks the fact that the real purpose of the action was to recover real property situated in King county. Assuming, without deciding, that an ordinary action of rescission of a land sale is local to the county where the land lies, in this case it is certainly as much local to King county as to Grays Har-

bor county.   We find no error in the granting of the change
of venue.

On the merits, the main contention is that there was fraudu-
lent and inducing misrepresentations as to the proportion
or amount of bottom land in the two hundred acres located
in Grays Harbor county.   Shortly after the commencement
of this action, two surveys were made; one on behalf of the
appellants classifying the land in Grays Harbor county as
follows:  hill land 14 acres, gravel bench 26 acres, river bed
and gravel bars 40.3 acres, bottom 116.6 acres, total 196.9
acres; the other on behalf of the respondents classified the
same land as follows:  first bottom 117.4 acres, second bot-
tom 6.3 acres, bench 13.3 acres, upland 32.5 acres, river and
gravel bars 30.5 acres, total 200 acres.   The alleged mis-
representation is based largely upon a memorandum made by
one Simpson, agent for respondents, from information gath-
ered in various conversations with Mills and given to appel-
lants a few days before the parties met.   This is referred to
as the "yellow sheet" and reads:

"Near Satsop.   Price for all $30,000.   242 acres.   55 up-
land and timbered.   Balance mostly bottom land.   All avail-
able for pasture that is not entirely cleared for ploughing.
38 cows.   1 registered Guernsey bull.   Fine one.   8 yearling
heifers.   12 this year heifers.   1 registered imported black
Percheron stallion.   2 registered black Percheron mares; one
imported.   2 registered black fillies.   1 registered black colt.
Can carry 50 cows.   16 hogs.   1 brood sow.   8 pigs.   100
to 125 tons of hay.   About 1500 bushels oats—spuds, ruta-
bagas, etc.   All tools, machinery and furniture.   Good 9
room house, concrete foundation.   Barn 75x90; stables on
each side.   2 hog buildings.   2 chicken houses.   1 milk room
and separator.   Wood house, smoke house, etc.   Full equip-
ment of tools, wagon, lawnmower, rake, discs, harrow, etc.
E. F. Simpson, care Burwell & Morford."

A few days before August 9th, the parties met in a real
estate office in Seattle and talked over the prospects of an
exchange, finally agreeing that together they would visit the
land so that appellants might examine it.   This trip was made

on August 8th or 9th, at which time appellants spent some three or four hours in examining the property in company with respondent Mills and one Gokey. Appellant Paul Wilson testified that he had the yellow sheet with him on the trip for the purpose of comparison with observed conditions. He knew that the Mason county land was all upland timbered. He knew that, if there were in all fifty-five acres of upland timbered, there would be left but one hundred and eighty-seven acres to meet the description "balance mostly bottom land." In addition to this, the sketch or map made by Mills at their first meeting, to which we shall presently advert, shows a tract marked "second bottom," which Wilson testified Mills told him contained about fifteen acres. Wilson, while examining the land, was on this tract and knew that it was included in the yellow sheet estimate of "balance mostly bottom land." He knew, also, that the Satsop river flowed across at least two of the forties. He knew, therefore, that whatever of the land was in the river bed and gravel bars was included in the yellow sheet estimate of balance mostly bottom land, as well as the fifteen acres of bench or second bottom. There was no representation in this yellow sheet as to how much of the land was actually river bed and gravel bars, but Wilson knew—he must have known—that it was included and classified as bottom land. Knowing, then, that the statement in the yellow sheet was not literally accurate, he cannot now be heard to say that he relied on it as being literally accurate.

In addition to the representations contained in the yellow sheet, appellant Paul Wilson testified that, at the first meeting with Mills and while he, Wilson, had the yellow sheet in his possession, Mills told him, in response to a direct question, that there were about fifteen acres in the river, also "At this time he said there was one hundred and seventy acres of bottom." This, however, was apparently his own deduction. He said: "I asked him how many acres of second bottom, this gravel bench. 'Fifteen,' he said, and taking thirty from the

total left·one hundred and seventy as I understood it. I sup-
posed when I bought the place I bought one hundred and
seventy acres of bottom land." Yet he knew at that time
that part of this one hundred and seventy acres was upland
timbered. Mills categorically denied making these state-
ments. He said, in substance, that he told Wilson the farm
contained two hundred and forty acres, forty acres upland
and a little more adjoining it, but the other two hundred
acres, or thereabouts, were mostly bottom land. But assum-
ing that he told Wilson at this first meeting what Wilson
says he did, nevertheless, when Wilson went to the land, saw
the bench land which Mills had estimated at fifteen acres,
knew that there were at least fifty-five acres of upland tim-
bered, and that at least thirteen acres of this fell in the two
hundred acres in Grays Harbor county, and knew that the
river crossed at least two of the forties and cut the corner of
a third, he must have known that Mills had included in his
classification of two hundred acres of bottom land all of the
land in the gravel bars and the river, wherever it was, just
as Simpson had included it in the yellow sheet.

Appellants concede, in their opening brief, that, as to
whether Mills actually represented that there were only fif-
teen acres of river bed was decided against them on fairly
conflicting evidence, and state that this point is not pressed
on this appeal. That concession seems to us to concede the
point so strongly argued touching representations as to the
amount of bottom land, since, under the evidence, the river
bed and gravel bars, whatever the amount, were included by
Mills in the general classification of bottom land, and Wilson
as a reasonable man must have so understood it.

The actionable misrepresentation, if any, as to the classi-
fication of the land is thus reduced to the claim that Mills
represented that the river did not cross the north forty of
the two hundred acres in Grays Harbor county. This is
based entirely upon the sketch made by Mills. It shows the
river as entering the land a little north of, and cutting a

small area from, the southeast corner of the north forty, flow-
ing diagonally across the next forty to the south, passing off
the land near the southwest corner of that forty and again
entering near the west line of the west forty, thence across it,
and out near the southwest corner. As a matter of fact, as
shown by both surveys, the river enters the north forty near
the middle of the north line and flows thence easterly and
south along the east line of that forty, entering the next
forty to the south at its northeast corner and thence ap-
proximately as shown upon the sketch. From a careful read-
ing of the entire evidence on the subject, we are satisfied that
Mills drew this sketch hastily, only intending to represent the
general course of the river, and that Wilson must have so
understood it at the time. Both Mills, and Simpson, who was
present when the sketch was made, testified in substance that
Mills said he did not know exactly where the river ran, "It
runs something like this," and hastily drew a line south of
the place as shown, then erased it saying, "It don't go like
that, it goes more this way," and drawing a line as it ap-
pears in the sketch. The sketch itself shows the erasure of
the first line and bears evidence of hasty execution. Whether
Mills knew exactly how the river affected the north forty,
though he still says he did not, the evidence is far from con-
vincing that, in making this sketch of the location of the
river, he intended to deceive Wilson or to represent it as an
exact sketch of its location. If the testimony of Mills and
Simpson is to be believed, Mills stated at that time that he
did not know the exact location of the river and intended only
to give an approximate idea of its course. Whether he did
know or not, the rough sketch so qualified cannot successfully
be made the basis of actionable fraud.

The claim of misrepresentation of boundaries is extremely
elusive. It rests in Wilson's statement that Mills pointed out
at a distance the west line of the north forty as running along
the edge of the hill. Mills disputes this and says he told Wil-
son he thought the line ran near the timber. The evidence as

a whole makes it plain that Mills did not attempt to point out the exact lines and in fact did not know them. The dis-, tance of the parties from the west line at the time would seem to preclude a definite indication of its exact location, on the one hand, and a definite apprehension on the other. No shortage is claimed in the entire tract. Wilson received the full two hundred acres in Grays Harbor county. If he was relying upon the location of this west line at some definite place as an inducing factor in the trade, he should then have asked for something more definite than he claims to have received, or should have called for a survey. The fact that he did neither is strongly indicative that he did not then consider the exact location of this west line of controlling importance.

The alleged misrepresentation of amount of upland also rests upon the yellow sheet. This contains the statement that there were fifty-five acres upland timbered. Both parties knew that the land in Mason county, about forty-two acres, was of that character, which would leave approximately thirteen acres of timbered to be found in the two hundred acres in Grays Harbor county. The survey made on behalf of Wilson and introduced by him shows only fourteen acres of upland in this two hundred. True, the survey made on behalf of Mills shows thirty-two and five-tenths acres of upland; but in this was evidently included part of what Wilson's surveyor designated as bench land. On such conflicting evidence touching the classification of this land, we cannot say that the trial court was not warranted in taking Wilson's evidence as his guide, since the burden of proving the alleged fraud was upon Wilson.

We cannot discuss in detail the evidence touching the various other allegations of fraudulent misrepresentation within the limits of an opinion. As to what the oats would yield, the probable amount of hay, and the comparison with Chehalis bottom land, we are satisfied that Mills attempted no more than an expression of opinion. The representation as to the income from the land is more serious; but upon this,

the evidence is in direct conflict. Mills denies having represented that his income from the land had been $5,000 a year. He also denies having represented that his income from the cows had been $80 or $90 every two weeks. He states that he told Wilson that he had planned to acquire fifty good Guernsey cows which he believed the land would support and that from these he could realize something like the amounts stated. Upon this conflict of evidence, we cannot say that the court would have been justified in finding actionable misrepresentation as to the income.

Every case of this character must rest upon its own facts, subject to certain general principles. We shall not attempt a detailed discussion of the many decisions cited from this and other courts. Wilson actually examined the land. Mills, so far as the record shows, exerted no artifice reasonably calculated to deter any ordinarily prudent man from a further examination if desired. We think the case is governed by the rule laid down by Pomeroy as follows:

"If, after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled." 2 Pomeroy, Equity Jurisprudence (2d ed.), § 893.

See, also, *Shores v. Hutchinson,* 69 Wash. 329, 125 Pac. 142; *Van Horn v. O'Connor,* 42 Wash. 513, 85 Pac. 260; *Stewart v. Larkin,* 74 Wash. 681, 134 Pac. 186; *Conta v. Corgiat,* 74 Wash. 28, 132 Pac. 746.

Finally, it must be remembered that Wilson was a man thirty-seven years old. Though not a farmer, he was a successful business man. The parties were dealing at arm's length. They had never met before this transaction. There was no relation of confidence between them nor any disparity in intelligence. So far as the record shows, Wilson knew as much about farm lands as Mills knew about city property. Wilson went all the way from Seattle to Grays Harbor county to examine this land. He cannot be heard to say that he looked at nothing but what Mills pointed out, saw nothing but what Mills wanted him to see, knew nothing but what Mills told him, acted on nothing but what he learned from Mills. It must be remembered this was a trade. The evidence makes it too plain for doubt that both parties puffed their wares and put in their respective properties at inflated trading prices. We are impressed with the justice of the trial court's language in his memorandum decision, which both parties have treated as findings:

"There is also credible testimony that, for some time before the formal act of rescission, Wilson had been convinced of his mistake in making the trade but reconciled himself to it with the thought, which he expressed, that even if he had made a bad bargain, Mills on his part had a poor bargain, for the Rainier Beach property had been largely overestimated in the deal. It is patent to the court, from the knowledge of both properties, that each party exaggerated the true value of his own property, and that such exaggeration was of about the same proportion in each instance. The properties were inflated in price for the purpose of trade. It is not fair to estimate one from a cash value and the other as a trading proposition."

The case has been one of much difficulty. We cannot, of course, discuss all of the evidence, but we have read all of it and considered all of it. It fails to warrant a reversal. The judgment is affirmed.

MORRIS, C. J., MOUNT, FULLERTON, and CHADWICK, JJ., concur.