[No. 31573. Department Two. May 10, 1951.]

L. V. RUMMER et al., *Respondents*, v. BUELL THROOP et al., *Appellants.*[1]

*Thomas I. Oakshott* and *Delbert R. Scoles*, for appellants.

*Del Cary Smith* and *Robertson & Smith*, for respondents.

HAMLEY, J.—The vendees under a contract to purchase a farm brought this action to rescind for fraud. The complaint alleges that false representations, upon which the vendees relied, were made with respect to the size and productive capacity of the farm, the acreage seeded, freedom from weeds, and the harmless effect of magnesium oxide dust from a nearby industrial plant. The plaintiffs sought recovery of $8,200 paid on the purchase price and $8,575 as consequential damages.

The vendors denied the principal allegations of the complaint. They also counterclaimed for recognition of their forfeiture of the contract and to recover $431 on miscellaneous items. Issue was joined on these pleadings, and the case was tried to the court without a jury.

The plaintiffs are L. V. Rummer (who will hereafter be referred to as if he were the only plaintiff and respondent), and his wife, Elsie Rummer. Rummer was born and raised on a farm. When he was twenty-eight years of age he left the farm and joined the Spokane police department. He remained with the police department for twenty-one years, and was then retired for disability. The year was then 1945. After leaving the police department, Rummer purchased and began operating an eighty-acre farm in Spokane county. It is referred to in the record as the Wild Rose Prairie farm.

He was assisted in this venture by his son Lloyd, then about eighteen years old. In 1946, Rummer and his son decided to exchange the eighty-acre farm for a larger one. Rummer listed his farm for sale or exchange with the Fred C. Ashley Company, Spokane real-estate agents and brokers, and made known his interest in acquiring a larger farm. On November 4, 1946, W. E. Stansbury, an agent employed by the Ashley company, took Rummer and his son to inspect a four-hundred-sixty-acre farm which had been listed for sale with the Ashley company. This farm was

owned by Buell Throop (who will hereafter be referred to as if he were the only defendant and appellant), and his wife, Dorothy Throop.

The Throop farm is located in the Colville valley about a half-mile south of Chewelah, in Stevens county. The farm is bounded on the west, for a distance of about a mile and a half, by state highway No. 3. Immediately across the highway from the middle of the farm is the plant of Northwest Magnesite Company. The north two hundred forty acres of this farm had been purchased by Throop in September, 1944, and is referred to in the record as the "Oppenheimer" place. The south three hundred acres had been purchased by Throop in June, 1946, from Northwest Magnesite Company. The deed from the company to Throop carries a covenant running with the land, saving the company harmless from any loss or damage resulting from dust or other deleterious substances emanating from the magnesite plant.

Throop had paid a total of twenty-one thousand dollars for these five hundred forty acres, but retained the northerly eighty acres of the Oppenheimer farm for himself when he offered the remaining four hundred sixty acres for sale. After acquiring this farm, Throop had made certain improvements. He had moved onto the premises a house which the trial court found was of the value of seven hundred fifty dollars; connected it with community water and electric facilities; constructed a barbed wire fence around half of the property; and constructed a corral and cattle chute. At the time the Rummers visited the premises in the fall of 1946, one hundred eighty-six acres had been newly sown to winter wheat.

Throop was not present on the farm when Stansbury and the two Rummers looked over the place. The crops had then been harvested, but some of the winter wheat was starting to come up and was visible. Upon the conclusion of the inspection, the three returned to Rummer's farm, where he signed an agreement to purchase the Throop farm. The purchase price was thirty-five thousand dollars. Rum-

mer's equity in the Wild Rose Prairie farm, valued at eighty-two hundred dollars, was to be accepted as the down payment. The balance was to be paid in annual installments of three thousand dollars each.

In the evening of that same day, Rummer was informed by his stepfather that he had better be careful "getting up in there." The stepfather warned that "you are going to get into some dust," and stated that the plant had given trouble ever since it had been there. Plaintiff then went to Stansbury and informed him that the "deal was off" because he had heard that dust kills the vegetation. Stansbury replied that "if there is such a thing, we will find out." He thereupon took Rummer to see Throop, who was then living on what was known as the Sisters' farm, situated on the northwest side of Chewelah. There plaintiff engaged in a discussion with defendant regarding the Throop farm, the gist of which will be referred to at a later point in this opinion. This discussion continued while they journeyed to the farm in question and made an inspection tour of the property.

Following this second visit to the Throop farm, Mr. and Mrs. Rummer went to the Ashley company office in Spokane and signed a sale agreement. This contract incorporated the same terms as were contained in the agreement to purchase which had been previously executed. Rummer vacated the Wild Rose Prairie farm and took possession of the Throop farm in March, 1947. Throop later sold the Wild Rose Prairie farm for eleven thousand dollars.

Rummer and his son spent their full time on the Throop farm until the fall of that year. Twenty-seven milk cows and a few beef cattle were acquired. Milk production was at first very satisfactory, with about nine ten-gallon cans being shipped each day. Shortly, however, the cows, which were pastured on the farm meadow land, began to get thin and sickly. Two or three died. Milk production dropped to around four ten-gallon cans a day. Rummer began selling off the sickly cows and buying others to take their place. Milk production, however, continued at a low level.

It was the testimony of Rummer and his son that the difficulty with the cattle was caused mainly by scouring. They believed this was due to the cows feeding on meadow grass which had been encrusted with magnesium dust. The testimony of several neighboring farmers tended to support this view. Defendants, on the other hand, produced a number of witnesses who testified that no particular difficulty of this kind had been experienced by them, and that scouring, if any, may have been due to the wet growth and canary grass on the low meadow land.

The Rummers also testified that, due to the dust from the magnesite plant, the grain crop was very poor. They estimated the production at from seven to ten bushels an acre. However, the record of their grain sales would indicate that production may have been twice that much. Their view that the grain crops were seriously affected by the operation of the magnesite plant was corroborated by the testimony of several other farmers, some of whom had previously farmed a part of the Throop place. Defendant produced several witnesses, also including one or two who had farmed a part of the same tract, who believed the magnesite plant adversely affected only the thirty-five or forty acres closest to the plant.

Rummer held a sale on November 12, 1947, and disposed of all of his cattle and farm equipment. He endeavored to sell the farm, but was unsuccessful. He did not pay the three-thousand dollar payment which came due on January 1, 1948, and also failed to pay some of the real-estate taxes. Throop served a notice of forfeiture on January 9, 1948, based upon Rummer's failure to make this payment and pay the taxes. Rummer countered with this action to rescind, commenced on February 7, 1948. Rummer remained in possession of the premises until March, 1948.

The trial court entered judgment decreeing a rescission of the contract and granting judgment for plaintiff in the sum of $8,111. The money judgment represents allowance in full of plaintiff's claim for return of the $8,200 payment on the purchase price, together with $1,550 of the $8,575

claimed for consequential damages. From this sum there was deducted $1,500 for the reasonable rental value of the farm during plaintiff's occupancy, and $139 on one of defendant's counterclaims. Defendant has appealed.

Appellant's first two assignments of error relate to the admission of testimony, over appellant's objection, as to damage from magnesium dust, and the entry of findings of fact based upon such evidence. It is stated in these assignments of error that the testimony complained of was immaterial, improper and incompetent. The specific objection which appellant made to the introduction of this evidence was as follows:

"MR. OAKSHOTT: At this time we are objecting on the grounds and for the reasons that the deed was definite knowledge by the plaintiff and definite notice to him that there were deposits of magnesium oxide on the place. The deed has now been pleaded. The contract has been pleaded in the complaint by the plaintiff. This testimony now would be absolutely in violation of the terms of a written instrument. For that reason we object on the ground it is immaterial and irrelevant."

The deed referred to was the deed from Northwest Magnesite Company to Throop, containing the release from liability referred to above. Rummer did not see that deed. The restriction in such deed, however, was referred to in the agreement to purchase, where, in a blank space following references to encumbrances, these words appear: "Restrictions in Deed from N. W. Magnesite Co." The sale agreement which Rummer later signed contains this statement: "The Rummer's agree to the restrictions contained in the deed from the Northwest Magnesite Company."

Appellant's argument in support of these assignments of error is to the effect that respondent had actual and constructive knowledge of the dust condition, and hence had no right to rely upon any representation which Throop may have made on the subject. No reason is given, and no cases are cited, tending to show that right to rely must be established before one seeking rescission may introduce evidence as to the claimed defective condition.

■ The right to rely upon a vendor's representations depends upon all of the circumstances of the case, including the facts regarding the actual condition of the property sold. Therefore the trial court, although confronted at the outset of the trial with evidence tending to indicate that the vendee had notice of the defect, is not warranted in excluding, for that reason, evidence regarding other phases of the case. In the case before us, the recitals of the deed and contract are pertinent on the question of respondent's right to rely, and will be considered in that connection. They provide no basis for excluding evidence relative to damage caused by magnesium dust. We are satisfied that the trial court did not err in receiving this evidence.

■ Appellant's third assignment of error and a portion of the fourth assignment raise the same question with respect to the reception of evidence pertaining to weeds on the premises. The agreement to purchase and the sale agreement make reference to the presence of weeds. Such references have an important bearing upon respondent's right to rely on representations regarding weeds. For the reasons indicated above, however, they do not warrant exclusion of evidence as to the weed condition actually encountered.

Appellant's fourth and fifth assignments of error challenge the entry of findings of fact Nos. 6 and 7. These findings recite that appellant and his agent made certain material representations for the purpose of inducing respondent to buy the farm. Appellant argues that the evidence clearly preponderates against these findings.

It is alleged in the complaint that appellant and his agent made twelve specific material representations for the purpose of inducing respondent to buy the farm. The trial court found that ten of these representations had been made. With respect to five of these representations, however, there was no correlative finding that the representations were false. Hence, the findings of fact regarding these five representations, whether or not soundly based, were not prejudicial to appellant and need not be considered.

The remaining five representations, which were found by the trial court to have been made, and to have been false,

are as follows: (1) The representation that the land would produce fifty to sixty bushels of wheat per acre; (2) the representation that the grass growing in the meadow was a mixture of canary, blue grass and clover; (3) the representation that the meadow would provide pasturage for from two to three hundred head of cattle the year around; (4) the representation that there were a few patches of Canadian thistles and other noxious weeds growing upon the premises, but that the land was not infested with weeds; and (5) the representation that there was no foundation for the report that magnesium dust affected the crops.

The first and third of these representations may be said to involve an implied representation that magnesium dust was not seriously detrimental to the farm. The fifth representation, however, deals specifically and directly with that subject. The trial court's finding of fact relative to the making of this representation is as follows:

"VII. Prior to entering into the contract hereinbefore described, plaintiffs heard rumors to the effect that the presence of magnesium dust upon the lands had prevented the growing of the crops thereon during prior years, and plaintiffs thereupon notified defendants' real estate broker hereinbefore named, that he was calling the deal off on account of said report. That said broker informed plaintiffs that he did not believe that such a report was true, and through an agent of said company, took the plaintiff L. V. Rummer to see the defendant Buell Throop, whereupon plaintiff asked the defendant if the magnesium dust affected the crops; that said defendant informed the plaintiff that there was no foundation for such a report and that the persons spreading said report were jealous of the success which he had made in operating said premises, and others in the neighborhood. Plaintiffs above named believed and relied upon the representations made by the defendants as alleged in the preceding paragraphs and, relying thereon, entered into the contract, a copy of which is attached hereto marked Exhibit 'B'."

The evidence upon which this finding of fact was based consisted of Rummer's and Throop's conflicting versions of the discussion they had when Rummer came back out to the place on his second visit. Throop's testimony is

supported by that of his real-estate agent, Stansbury. The trial court apparently accepted Rummer's version of the conversation. We are not in a position to say that the evidence clearly preponderates against that finding.

■ A more serious question is whether respondent had a right to rely upon this representation. In cases involving alleged fraudulent representations, the plaintiff must establish, as a part of his case, that he had a right to rely upon the representation which was made. *Webster v. L. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428; *Marion v. Grand Coulee Dam Hotel*, 35 Wn. (2d) 589, 214 P. (2d) 204; *Salter v. Heiser*, 36 Wn. (2d) 536, 219 P. (2d) 574. The inquiry as to vendee's right to rely involves the question of his diligence in ascertaining the facts for himself. It also involves his exercise of care and judgment in acting upon representations which run counter to knowledge within his possession or reach.

In *Cunningham v. Studio Theatre, ante* p. 417, 229 P. (2d) 890, this court quoted with approval the following statement regarding the right to rely:

■ " 'The rule is followed at the present time in practically all American jurisdictions, in respect of transactions involving both real and personal property, that one to whom a positive, distinct, and definite representation has been made is entitled to rely on such representation and need not make futher inquiry concerning the particular facts involved. This rule is a corollary to the broad principle of a general right of reliance upon positive statements. Under this rule it is sufficient if the representations are of a character to induce action, and do induce it, and the only question to be considered is whether the misrepresentations actually deceived and misled the complaining party. Under such circumstances, it is immaterial that the means of knowledge are open to the complaining party, or easily available to him, and that he may ascertain the truth by proper inquiry or investigation.' [23 Am. Jur. 970, Fraud and Deceit, § 161.]"

Tested by this rule, there seems little doubt that Rummer had the right to rely upon Throop's representation. By reason of the information which had come to him through

the several sources referred to above, very serious doubts had been raised in Rummer's mind regarding the dust situation. He could have queried neighboring farmers and learned the truth. He could have gone to the county auditor's office and examined the deed, which made specific reference to damage from magnesium oxide dust. Instead, Rummer went to the vender, Throop, for the facts. Rummer may have been foolishly credulous in doing this, but that would not deprive him of the right to rely.

Throop's reassurance was of a character to deter further inquiry. It had that effect. Rummer's fears were immediately quieted, especially after receiving the agent's assurance that Throop's word could be relied upon. Rummer made no further investigation. He signed the sale agreement before the day was out. He testified that it was explained to him that the restriction clause in the Northwest Magnesite Company deed, referred to in the sale agreement, was a mere formality. The reference to this restriction does not mention dust.

■ Where a representee makes only a partial investigation, and relies in part upon the representations of the adverse party, and is deceived by such representations, the authorities agree that he has a right to rely, and may maintain an action for such deceit. *Rimling v. Scherper*, 206 Wis. 532, 544, 240 N. W. 159, 164; 23 Am. Jur. 952, Fraud and Deceit, § 147; 37 C. J. S. 281, Fraud, § 34.

The rule just stated is particularly applicable where as here, the representation was designed to deter further investigation. In fraud cases where this court has held for the defendant, it has often been pointed out that nothing was said by the defendant to deter the plaintiff from making an investigation. See *Stewart v. Larkin,* 74 Wash. 681, 134 Pac. 186; *MacKay v. Peterson,* 122 Wash. 550, 211 Pac. 716; *Marion v. Grand Coulee Dam Hotel Co., supra,* p. 595. In *Wescott v. Wood,* 122 Wash. 596, 212 Pac. 144, the decision affirming a judgment for the plaintiff in a fraud action contains this comment:

"Indeed, the representations were such as would naturally lead respondent to deem it unnecessary to make any investigation." (p. 601.)

Assuming that Throop had no duty to volunteer information relative to dust damage, such duty clearly attached as soon as the vendee made specific inquiries of the vendor regarding that matter. It then became Throop's duty to inform Rummer fully and truthfully, and to say nothing which would deter Rummer from investigating further. In this respect the case before us is much like *Miraldi v. Wick,* 117 Wash. 207, 200 Pac. 1094. There the respondent vendee was permitted to recover damages for fraud, upon a showing that the alkali content of the soil was excessive, even though the vendee had inspected the premises. We said:

"The respondent, if his testimony is to be believed, did not know that there was alkali in the land sufficient in quantity to prevent growing crops thereon; and it was the duty of the appellants, if they undertook to inform him on the subject at all, to inform him truthfully, and are answerable for the damages suffered by him if they did not so inform him." (p. 210)

It is our opinion, in view of the foregoing considerations, that respondent had the right to rely upon appellant's reassurance as to the dust situation. This representation alone was sufficient to justify rescission, if found to be false. It is therefore not necessary to consider whether the findings of fact relative to the other asserted representations are contrary to the clear preponderance of the evidence.

Assignments of error Nos. 6 and 7 are directed against the trial court's findings of fact Nos. 8 and 9. It is argued that the evidence clearly preponderates against these findings.

Findings of fact Nos. 8 and 9 recite that five specified representations, which the court found had been made, were false, fraudulent and untrue in certain particulars, and had been made with full knowledge of their falsity and for the purpose of deceiving respondent. With respect to the representations, express and implied, as to the harmless character of the magnesium dust, the court found the facts to be

as alleged in the complaint. Specifically, the court found that, due to the presence of such dust, the cattle became sickly and emaciated, and milk production was reduced to such an extent that respondent could no longer profitably operate a dairy on the premises.

The court also found that deposits of magnesium oxide dust had practically destroyed the productivity of the land, and that it had not been profitably operated for many years. In this connection the findings recite:

". . . That defendants had, in fact, purchased some of said lands from the magnesium company for a sum substantially less than the price for which defendants sold said lands to the plaintiffs and that the lesser amount paid by the defendants to said magnesium company for said lands was by reason of the fact that defendants and said magnesium company both knew that the productivity of the soil upon said lands had been greatly reduced by reason of said magnesium oxide dust, and that said magnesium company had acquired said lands by purchase from prior owners by reason of the damage caused to said lands by the magnesium dust emanating from its plant."

The testimony was in conflict as to the physical condition of Rummer's cows, the cause of such condition, milk production, and the extent to which the dust affects vegetation on the farm. We have examined the evidence relative to these matters, and it is our conclusion that the evidence does not preponderate against the court's finding. The portion of such finding quoted above seems to stand practically undisputed in the record.

Assignment of error No. 8 relates to finding of fact No. 10. This finding recites, in effect, that after respondent discovered the adverse effect which the dust was having, he discussed the matter with appellant, but that the latter refused to negotiate with respondent or in any manner modify the contract. Appellant states in his brief that this finding is not supported by the evidence, "but it does seem to be immaterial." We agree with this latter statement. This finding of fact was not necessary to support the judgment, and is therefore not prejudicial.

Assignments of error Nos. 9 and 10 challenge findings of fact Nos. 11 and 12, on the ground that the evidence clearly preponderates against such findings. Finding of fact No. 11 relates to three items of respondent's claim for consequential damage. Respondent sought $3,475 under these three items, but the findings referred to above allowed only $1,450. Respondent sought consequential damages in the sum of $5,100 under three other items, all but one hundred dollars of this being disallowed. Finding of fact No. 12 relates to the adverse effect which dust-encrusted pasture feed had upon the physical condition of the cows and their milk production. The evidence respecting the matters covered in findings of fact Nos. 11 and 12 has been carefully examined. There is a definite conflict in the testimony on these points. The trial court not only had the advantage of hearing the witnesses, but also inspected the premises during the course of the trial. We find no basis for holding that the findings in question are against the clear preponderance of the evidence.

Assignment of error No. 11 is directed against finding of fact No. 13, wherein the reasonable rental value of the farm for the period of respondent's occupancy was fixed at fifteen hundred dollars. Appellant argues that this sum is wholly inadequate to compensate appellant for the rental of the property or to do appellant equity.

The allowance of rental in connection with the rescission was called for under the general rule that he who seeks equity must do equity. This rule, as stated in *Hopper v. Williams*, 27 Wn. (2d) 579, 587, 179 P. (2d) 283, is as follows:

"On the principle that he who seeks equity must do equity, it is the general rule that one who demands rescission of a contract of purchase to which he is a party must restore or offer to restore to the other party whatever he may have received under the contract in the way of money, property, or other consideration or benefit. [Citing authorities.]"

Testimony on behalf of respondent tended to show that gross receipts for his year of operation were in the neigh-

borhood of fifty-six hundred dollars, and that there was a net loss for the year. Testimony on behalf of appellant tended to show that respondent's gross receipts for the year were about sixteen thousand seven hundred dollars, no attempt being made to establish net income. The trial court made no findings of fact as to gross or net income. The finding as to fair rental value was apparently based upon testimony which was received on that particular subject. Respondent testified that a fair rental would be fifteen hundred dollars. Appellant set the proper rental at between sixty-five hundred and seventy-five hundred dollars. Another witness testified that he had rented the original Oppenheimer farm, consisting of two hundred forty acres, for five hundred dollars.

Having in mind the testimony relative to the effect of magnesium dust in curtailing milk and grain production, and the fact that appellant had the use of respondent's Wild Rose Prairie farm during that same year, we are of the view that the trial court did not err in fixing the rental at fifteen hundred dollars.

Assignments of error Nos. 12, 13 and 14 are general in nature, and are disposed of by what has already been said. The final assignment of error relates to the denial of appellant's motion for reconsideration and motion for new trial. In support of this motion, appellant produced the affidavits of four witnesses to the effect that, between the period of June 1 to 3, 1950, they had examined the farm in question, and found a good stand of grain which compared favorably with the crops being raised on other farms out of range of the magnesite plant. An additional affidavit, identifying certain photographs of the farm which were taken on June 1, 1950, was also presented by appellant. The affidavits, but not the photographs, are before us in the record.

These affidavits were controverted by two affidavits signed by respondent, and one affidavit signed by four of respondent's witnesses at the trial. Each of these latter witnesses had, at various times, farmed portions of the land in controversy.

We have examined all of the affidavits signed by both parties, and find no basis for holding that the trial court abused its discretion in denying the alternative motion for reconsideration, or for a new trial.

The judgment of the trial court is affirmed.

SCHWELLENBACH, C. J., ROBINSON, MALLERY, and GRADY, JJ., concur.