**STANDARD LUMBER & MANUFAC-TURING COMPANY, a corporation,**
**Appellant,**

v.

**Jess JOHNSTUN, Leola Johnstun, Theron Johnstun and Maxine M. Johnstun,**
**Appellees.**

**No. 16818.**

United States Court of Appeals
Ninth Circuit.

Dec. 29, 1960.

Jerome S. Bischoff, S. J. Bischoff, Portland, Or., for appellant.

Koerner, Young, McColloch & Dezendorf, James C. Dezendorf, Joseph Larkin, Portland, Or., Eddleman & Wheeler, William R. Eddleman, Seattle, Wash., for appellees.

Before ORR, MERRILL and KOELSCH, Circuit Judges.

ORR, Circuit Judge.

■ Appellant purchased six mining claims from appellees and later brought an action for rescission, alleging it had been defrauded. The trial court found no actionable misrepresentations had been made and denied appellant relief. The solution of this appeal falls into the well settled rule that if there is substantial evidence to support the trial court's findings we must affirm them. We find such substantial evidence in the record.

■ Appellees sold appellant six mining claims with the timber situate thereon. In asking for rescission appellant attempts to paint a picture of a slick promoter taking the trusting representative of a gullible business man out into the timber land and pointing out a fine growth of timber on land not belonging to the seller. As we read the record the picture which appellant endeavors to portray fades and another emerges; it is that of a shrewd lumber company executive who takes precautions and employs and sends to inspect the property men who are experts in appraising timber and eminently qualified to determine land locations and boundaries, with the means at hand to make such determinations, had they cared to utilize them.

The events surrounding the sale to appellant were the subject of conflicting testimony. William M. Elwood, a timber scout for appellant, learned that Dwight Johnson (hereinafter "Dwight"), appellees' agent, had some timber for sale and asked to see it. Dwight took Elwood out to inspect the claims, taking him to a blazed stump; this stump had been pointed out to Dwight by one Bratz as being the center line corner of the Cammeo claim at or about the time appellees purchased the claims in January of 1955. Elwood was highly impressed and reported favorably to John S. Pankratz, President of appellant company. Mr. Pankratz engaged Ross Ensley, a consultant

forester, to appraise the claims and cruise the timber (a process whereby the total amount of timber on a claim is estimated by examining a representative strip). On December 8th, Dwight took Ensley and Elwood to what was supposed to be the Cammeo claim, again pointing out the blazed hemlock stub. Dwight testified that he told Elwood and Ensley that this was the place pointed out by Mr. Bratz as the line but that he (Dwight) had been unable to find anything to confirm it. Dwight further testified that he did not point out any timber as being the timber for sale, that he told them that Bratz had said this was the general area but that "we had not had it surveyed and to my knowledge it hadn't been surveyed since the patent in 1905 or '06." It is admitted that Dwight accompanied Ensley as he cruised a 66′ strip through the surrounding Douglas Fir, and that Dwight at no time informed either Ensley or Elwood that appellees had told him and a Mr. Allen that the latter's surveyor had said the true Cammeo claim was farther east in much poorer timber. On the other hand, Ensley admitted that he asked Dwight to point out the side corners and that Dwight said neither he nor anyone else had been able to find these legal corners, and they proceeded to look for the corners in the location where they should have been and were unable to find them. Ensley testified that there were blazed lines near the location where the corners should have been which Dwight said were the intersecting claim lines; however Ensley also testified that there were blaze lines all through that area.[1] While Dwight, Elwood and Ensley were looking over the property Dwight had in his possession a mineral map, but Ensley testified that Dwight kept it pretty much to himself and didn't make it very available while they were in the field. The mineral map depicted a mineral monument nearby, and Ensley testified that he could have used a process

---

1. Indeed it appears that during the cruise they came quite close to the actual northwest corner of the Cammeo claim and saw a number of marked and blazed trees but Dwight said they were nothing, that there were lines all over the country up there.

called "offsetting" to locate the true corner of the Cammeo claim sufficiently to reveal that the purported center line was much too far west; however, he said that this would have taken considerable time, especially since there was deep snow. Ensley also admitted: (1) that he could have gotten field notes from the U. S. Department of Land Management at Spokane and conducted a survey in three days, which would have revealed the true location of the Cammeo claim; (2) that he could have obtained information with respect to the location and description of the section corners and quarter-corners at the King County Courthouse nearby, and once having found the quarter-corner he could have certainly oriented himself; and (3) that he knew he could inquire of the Forest Service people in charge of a particular area as to the location of quarter-corners and usually obtain helpful information from them. Ensley said the reason he did none of these things was that he was only hired to cruise the timber, and not to survey the claims or check to determine whether this was the correct location. However, Mr. Pankratz, appellant's President, testified that he expected Ensley to verify the location of these claims and he relied on Ensley to determine the location, though he also stated that they relied on Dwight to point out the correct starting point.

Upon receiving Ensley's favorable report appellant purchased the six claims for $50,000. In the spring of 1956, after the snow melted, appellant employed Ensley to survey in a logging road so that the timber could be removed. Dwight was to assist in locating the corners. Ensley testified that he became suspicious of Dwight's attitude and conduct and caused a boundary survey to be made, whereupon he discovered that the actual Cammeo claim was 1100' east of the blazed stub and contained much poorer and less accessible timber. Appellant wrote appellees advising them of the discovery and requesting a conference to discuss a settlement. No settlement having been made, appellant on February 7, 1957, demanded rescission of the transaction and tendered a return of the mining claims. The present suit was commenced on October 28, 1957.

The District Court found that appellant had relied primarily upon its own representatives to determine the location and value of the claims, and not upon Dwight, and that appellant had delayed unduly in rescinding the sale after discovering the error. The court held that this action was barred by the doctrine of caveat emptor and the doctrine of laches.

■ In order to rescind a sale because of fraud or misrepresentations the vendee must prove, as part of his case, that he relied and had a right to rely on the false statements. Rummer v. Throop, 1951, 38 Wash.2d 624, 231 P.2d 313; Webster v. L. Romano Engineering Corp., 1934, 178 Wash. 118, 121, 34 P.2d 428, 430. The Washington Supreme Court recognizes that decision of this question rests largely upon the facts of each case. Marion v. Grand Coulee Dam Hotel et al., 1950, 35 Wash.2d 589, 214 P.2d 204; Wilson v. Mills, 1916, 91 Wash. 71, 157 P. 467. However, certain determining factors emerge from the cases:

■ 1. Positive statement of fact. It is important whether the vendor makes a positive statement of fact as of his own knowledge, or makes only a vague statement or informs the vendee that he is only basing his statement upon what another has said. Jenness v. Moses Lake Development Co., 1951, 39 Wash.2d 151, 234 P.2d 865; Stewart et al. v. Larkin et al., 1913, 74 Wash. 681, 134 P. 186, L.R.A. 1916B, 1069; Fischer v. Hillman, 1912, 68 Wash. 222, 122 P. 1016, 39 L.R.A., N.S., 1140. While Dwight's actions in taking appellant's representatives to the blazed stub, standing by while they cruised the Douglas Fir, and failing to inform them that he had reason to doubt whether this was the actual Cammeo claim were misleading in that they implied that so far as Dwight knew this was the Cammeo claim, the trial court evidently credited Dwight's testimony that he told these representatives that he was relying on Mr. Bratz's statements

and had not had the claims surveyed himself, and that court concluded that Dwight never positively asserted that this was the claim. Appellant's witnesses testified that Dwight's statements about boundaries were vague, and his statement that no one had been able to find the corners of the purported claim was an assertion that he did not know the exact location of the Cammeo claim.

2. Vendee's experience. Also important is whether the alleged victims are capable, experienced people or simple, gullible folks unable to protect themselves. See Chiles v. Kail, 1949, 34 Wash. 2d 600, 208 P.2d 1198; MacKay et ux. v. Peterson et ux., 1922, 122 Wash. 550, 211 P. 716; Fischer v. Hillman, 1912, 68 Wash. 222, 122 P. 1016. The trial court said:

"It must be borne in mind that both the Johnstuns and Standard were dealers in the sawmill and timber-purchase businesses and that throughout the parties dealt at arms' length; that each knew they were dealing with mining-claim timber and of the hazards involved in the true location of boundaries of mining claims."

Had Standard been a novice concerning the purchase of timberlands, perhaps vague and indefinite assertions could have been relied on in determining whether to make a given timber purchase. Here, however, Mr. Pankratz testified that appellant was not in the habit of relying on vendors' representations and that appellant relied on Mr. Ensley to ascertain the location of the claims involved. Both Elwood and Ensley were experienced in their fields and Ensley testified that he knew four different ways he could have ascertained that the true Cammeo claim was much farther east; it is true that these might have involved several days time and expense, but surely that is not too great a precaution when a $50,000 purchase is at stake.

3. Suspicious circumstances. A third factor is whether the vendee reacts responsibly to suspicious circumstances or to representations which run counter to knowledge within his possession or reach. See Paxport Mills v. Stohr, 1954, 45 Wash.2d 667, 277 P.2d 332; Rummer v. Throop, 1951, 38 Wash.2d 624, 231 P.2d 313. It is clear that Ensley knew of the legal requirement that all mining claims have marked corners, and Dwight admitted to him that no one to his knowledge had been able to find the corners of the purported Cammeo claim; Ensley, Elwood and Dwight were also unable to find them when they made a search. Ensley and Elwood should have known that Dwight was basing his representations as to the blazed stump on statements made to him by Bratz. In addition it must have been apparent to appellant that Dwight was at least exaggerating as to some statements because if Dwight's alleged statement that the timber on all the claims was like that on the purported Cammeo claim had been true the tract should have been selling for far more than $50,000, taking appellant's estimate of the value of the stand of timber on the purported Cammeo claim alone. Yet in spite of all these warnings appellant did not pursue any of the methods whereby it could have determined the location of the true Cammeo claim.

In view of the indefinite nature of appellee's representations, the suspicious circumstances, and appellant's failure to pursue known methods which would have revealed the true boundaries of the Cammeo claim, we conclude that any damage appellant suffered was due to its own willful failure to protect itself; therefore, the doctrine of caveat emptor was properly applied by the District Court.

Affirmed.